The Chief Justice delivered a learned and circumstantial charge to the jury. After stating the proclamation, the issue, and the evidence, he proceeded as follows :
 

 McKean, Chief Justice.
 

 The question that is to be decided on the facts before us, is, whether Samuel Chapman, the prisoner at the bar, ever was a subject of this commonwealth ? The reason which has been principally urged to take him out of that description, is that on the 26th day of December, in the year 1776, when he withdrew from Pennsylvania, no government existed to which he could owe allegiance as a subject. I shall, in the first place, consider how *far this defence, under the circumstances of the case, would avail the prisoner upon an indictment for high >- treason.
 

 The Attorney-General has referred to the declaration of Independence, on the 4th of July 1776, when the freedom and sovereignty of the several states were announced to the world; and also, to a resolution of congress recommending the formation of such governments, as were adequate to the exigency of the public affairs. The sister states pursued different modes of complying with this recommendation. The citizens of Connecticut, New Hampshire and Rhode Island, considered themselves in a situation similar to that which occurred in England, on the abdication of James the second; and, wanting only the form of a royal governor, their respective systems of government have still been continued; while the other states adopted temporary expedient s, un-til regular constitutions could be formed, matured and organized.
 

 
 *54
 
 And here it is contended, that, prior to the constitution under which we now live, the state of Pennsylvania was governed by a council of safety, and committees. But to this, it is answered, that until laws were passed by a competent legislative power, no government could be said to exist; and, as the act of the 28th of January 1779, for the revival of the laws, virtually declares that they were suspended from the 14th May 1776, until the 11th February 1777, it is inferred, that during that period, no allegiance was due, and no treason could be committed.
 

 Although I think this point immaterial to the prisoner, since a government might have existed, and yet not be of such a nature as to affect him, it cannot be denied, that a kind of government, independent of Great Britain, was administered in Pennsylvania, antecedent to the establishment of the present constitution. The powers of sovereignty were then lodged with congress, under whose authority a council of safety had been elected by the people, and were employed, in conjunction with other committees, to conduct the war, and to secure, as far as so imperfect a system could, the rights of life, liberty -and property within this state. It is certain, indeed, that a formal compact is not a,necessary foundation of government; for, if an individual had assumed the sovereignty, and the people had assented to it, whatever limitations might afterwards have been imposed, still this would have b.een a legal establishment. No express provision, however, has been at any time made, for defining what should be treason against those temporary bodies; but it may be well enough to observe, that treason is a crime known to the common law.
 

 Afterwards, we find, that a General Convention, elected by the people, met on the 15th day of July 1776, for the express purpose of framing a new government; and during the sessions of this body, its members, collectively, assumed the powers of making ordinances, of appointing members' of congress, and of defining high treason, and its punishment. All their proceed-*_^-i ings and injunctions, except the ordinance respecting treason, were -* approved and executed; *and the constitution which they eventually agreed upon, was incontrovertibly a dissolution of the government, as far as related to the powers of Great Britain, but not in relation to the powers which had been before exercised by councils and committees.
 

 The Attorney-General has urged that, at least, as soon as the government under the new constitution was formed, which he says was on the 28th of November 1776, the members of council being then chosen, and the legislature actually assembled, the sovereignty of the state was complete, and allegiance followed, by a necessary consequence, without the intervention of any positive law. But the advocates for the prisoner again object, that the government cannot be said to be established, until there is a meeting of all its parts, and that as the executive council never met until the 4th of March 1777, the state was incapable of affording protection, and therefore, was not entitled to allegiance, before that time.
 

 'On this occasion, the sentiments of several eminent
 
 civilians
 
 have been read to us; not as authorities binding upon our judgment, but as a means of information derived from the great learning and abitities of the respective writers, and, principally indeed, on account of the intrinsic weight of the reasons by which their doctrines are supported. Locke says, that when the executive is totally dissolved, there can be no treason; for laws are a mere
 
 *55
 
 nullity, unless there is a power to execute them. But that is not the case at present in agitation
 
 •,
 
 for before the meeting of council in March 1777, all its members were chosen, and the legislature was completely organized : so that there did antecedently exist a power competent to redress grievances, to afford protection, and generally, to execute the laws; and allegiance being naturally due to such a power, we are of opinion, that from the moment it was created, the crime of high treason might have been committed by any person, who was then a subject of the commonwealth. The act of the 11th of February 1777, expressly authorizes this opinion; for, we find it there said, “That all and every person and persons (except prisoners at war)
 
 now
 
 inhabiting,
 
 &o.,
 
 within the limits of this state; or that shall
 
 voluntarily
 
 come into the same
 
 hereafter
 
 to inhabit, &c.,
 
 do
 
 owe, and shall pay allegiance, &c.” This, therefore, contradicts the idea, suggested by the advocates for the prisoner, that allegiance was not due until the meeting of the executive council, on the 4th of March ensuing ; and, although he cannot be convicted upon that act, yet allegiance being due from the 28th of November 1776, when, as I have already observed the legislature was convened, and the members of council were appointed, treason, which is nothing more than a criminal attempt to destroy the existence of the government, might certainly have been committed, before the different qualities of the .crime were defined, and its punishment declared by a positive law. 1 Bl. Com. 46.
 

 Having thus dismissed the preliminary question, whether the prisoner’s defence would avail him upon an indictment for high treason, *1 shall ™ ' proceed to inquire, if there are any circumstances that take his case L out of the general opinion expressed by the court upon that point.
 

 The act for the revival of the laws, passed the 28th of January 1777, waa intended, I think, merely to declare, that those laws which were originally enacted under the authority of George the Third, ceased any longer to deriva .their virtue and validity from that source. But there is great inaccuracy in penning the act; for, though it would seem, by the former part of the second section, to be the sense of the legislature, that from the 14th of May 1776, to the 10th of February 1777, the operation of all the acts of assembly should be suspended; yet, in the close of the same section, obedience to those acts, to the common law, and to so much of the statute law of England, as have
 
 heretofore
 
 been in force in Pennsylvania, is, with some exceptions in point of style and form, expressly enjoined. We may, however, fairly infer from the general tenor of the act, that those who framed it, thought the separation from Great Britain worked a dissolution of all government, and that the force, not only of the acts of assembly, but of the common law and statute law of England, was actually extinguished by that event.
 

 This, therefore, necessarily leads to the consideration of a very important subject. In
 
 civil wars,
 
 every man chooses his party; but generally that side which prevails, arrogates the right of treating
 
 those who
 
 are vanquished as rebels. The cases which have been produced upon the present controversy, are of an old government being dissolved, and the people assembling in order to form a new one. When such instances occur, the voice of the majority must be conclusive, as to the adoption of the new system; but all the writers agree, that the minority have, individually, an unrestrainable right to remove with their property into another country; that a reasonable time for that purpose ought to be allowed ; and, in short, that none are subjects of the
 
 *56
 
 adopted government, who have not freely assented to it. What is a reasonable time for departure may, perhaps, be properly left to the determination of a court and jury. But whether a man should be suffered to join a party, or nation,
 
 at open war
 
 with the country he leaves, is a question of singular magnitude. The ground is hitherto untrodden, but there is such apparent injustice in the thing itself, that I am inclined to think, it would amount to an act of treason. Puffendorf, 639.
 

 This is not, however, the situation of the prisoner. Pennsylvania was not a nation at war with another nation; but a country in a state of
 
 civil
 
 war, and there is no precedent in the books to show what might be done in that case ; except, indeed, where a prince has subdued the people who took arms against him, before they had formed a regular government, which is, likewise, inapplicable here.
 

 But this difficulty seems to vanish, by having recourse to the opinion of the legislature, in their act of the 11th February 1777; for, when describing * Q-. from whom allegiance is due, they speak only *of persons
 
 then
 
 inhabiting the state, or who should
 
 thereafter
 
 become its inhabitants. Hence, a discrimination is evidently made between those persons, and such as had previously joined the enemy; meaning that this election to adhere to the British government, should not expose the party to any future punishment. It is true, that there are not any negative words to this effect; but, taking the act for the revival of the law also into consideration, we think the design and intention of the legislature sufficiently appears to have been, to allow a choice of his party to every man, until the 11th of February 1777; and that no act savoring of treason, done before that period, should incur the penalties of the law.
 

 This construction, it may be said, is favorable to traitors, and tends to the prejudice of the commonwealth. But we cannot be influenced by observations of a political nature in the exposition of the law; it is our duty to seek for, and to declare, the true intention of the legislature; the policy of that intention, it is their duty to consider. The sentiments which I have now delivered, I always entertained. On the 13th of August 1779, the Executive Council had sixteen or seventeen persons in their power, who, though not attainted, were in circumstances similar to the prisoner’s. On that occasion, I was consulted, and gave the same opinion; but with great diffidence, owing to the novelty of the question. Those persons were, accordingly, treated as prisoners of war.
 

 But there is yet another important point to be examined in the case before us. By an act, subsequent to all those which have been mentioned, it is declared, “ that all and every person and persons
 
 being subjects or inhabitants of this state,
 
 or those who have real estate in this commonwealth,
 
 who now adhere to,
 
 and knowingly and willingly aid and assist the enemies of this state, or of the United States of America,
 
 by having joined their armies
 
 within this state, or elsewhere, or who hereafter shall do the same, and whom the Supreme Executive Council of this state, by their proclamations, to be issued under the state seal, during the continuance of the war with the king of Great Britain, shall name and require to surrender themselves, by a certain day therein to be mentioned, to some, or one, of the justices of the supreme court, &c., and shall not render themselves accordingly, &c., shall, from and after the day to them to be prefixed by such
 
 *57
 
 proclamation, stand and be attainted of high treason to all intents and purposes, &c.” Under the authority of this clause, the prisoner was duly required by proclamation to surrender himself; and therefore, his case seems to come properly within the act.
 

 Generally speaking,
 
 ex post facto
 
 laws are unjust and improper; but there may certainly be occasions, when they become necessary for the safety and preservation of the commonwealth; and although no legislature had previously met, yet the assembly that passed this law, if they were impressed with the necessity of the case, had, ineontrovertibly, a right to declare any person a traitor who had gone over to the enemy, and still adhered to them. The validity *and operation of the law, however, the prisoner is now precluded from controverting, if, at any time [*60 before the date of the proclamation, he was a subject of the state of Pennsylvania.
 

 Here, then the matter rests. Had the issue been in the
 
 disjunctive,
 
 the prisoner would clearly have come within the description of an inhabitant of Pennsylvania; but when the word
 
 subject
 
 is annexed, it means a subjection to some sovereign power, and is not barely connected with the idea of territory — -it refers to one who owes obedience to the laws, and is entitled to partake of the elections into public office. On this point, therefore, we must again advert to the act of assembly, declaring what shall be treason, which has no retrospect, and to the act for the revival of the laws, which implies a suspension of all the laws from the 14th of May 1776, to the 11th of February 1777. If there were no laws to be obeyed, during that period, the prisoner could not be deemed a subject of the state of Pennsylvania, on the 26th day of September 1776. Whether the legislature meant to include tliis case, we will not positively determine — it is a new one, and we ought to ti-ead cautiously and securely. But, at all events, it is better to err on the side of mercy, than of strict justice.
 

 The jury found a verdict of
 
 Not guilty.
 

 (a)
 

 (a)
 

 d)
 
 See Penhallow
 
 v.
 
 Doane, 3 Dall. 54.