46 U.S. 441 (____)
5 How. 441
NATHANIEL S. WARING AND PETER DALMAN, OWNERS OF THE STEAMBOAT DE SOTO, HER TACKLE, APPAREL, AND FURNITURE, APPELLANTS,
v.
THOMAS CLARKE, LATE MASTER OF THE STEAMBOAT LUDA, AND AGENT OF P.T. MARIONOUX AND T.J. ABEL, OWNERS OF SAID STEAMBOAT LUDA, HER TACKLE, APPAREL, FURNITURE, AND MACHINERY, APPELLEES.
Supreme Court of United States.

*451 The cause was argued by Mr. Johnson, for the appellants, and Mr. Crittenden, for the appellees.
Mr. Justice WAYNE delivered the opinion of the court.
This is a libel in rem, to recover damages for injuries arising from a collision, alleged to have happened within the ebb and flow of the tide in the Mississippi river, about ninety-five miles above New Orleans.
The decree of the Circuit Court is resisted upon the merits, and also upon the ground that the case is not within the admiralty and maritime jurisdiction of the courts of the United States.
We will first consider the point of jurisdiction.
The learned counsel for the appellants, Mr. Reverdy Johnson, contended, that, even if the evidence proved that the collision took place within the ebb and flow of the tide, the court had not jurisdiction, because the locality is infra corpus comitatus.
Two grounds were taken to maintain that position.
1. That the grant in the constitution of "all cases of admiralty and maritime jurisdiction" was limited to what were cases of *452 admiralty and maritime jurisdiction in England when our Revolutionary war began, or when the constitution was adopted, and that a collision between ships within the ebb and flow of the tide, infra corpus comitatus, was not one of them.
2. That the distinguishing limitation of admiralty jurisdiction, and decisive test against it in England and in the United States, except in the cases allowed in England, was the competency of a court of common law to give a remedy in a given case in a trial by jury. And as auxiliary to this ground it was urged, that the clause in the ninth section of the Judiciary Act of 1789 (1 Statutes at Large, 77), "saving to suitors in all cases the right of a common law remedy, where the common law is competent to give it," took away such cases from the admiralty jurisdiction of the courts of the United States.
The same positions have been taken again by Mr. Ames and Mr. Whipple, in the case of the New Jersey Steam Navigation Company v. The Merchants' Bank of Boston. Every thing in support of them, which could be drawn from the history of admiralty jurisdiction in England, or from what had been its practice in the United States, and from adjudged cases in both countries, was urged by those gentlemen. All must admit, who heard them, that nothing was omitted which could be brought to bear upon the subject. We come, then, to the decision of these points, with every advantage which learned research, and ingenious and comprehensive deduction from it, can give us.
It is the first time that the point has been distinctly presented to this court, whether a case of collision in our rivers, where the tide ebbs and flows, is within the admiralty jurisdiction of the courts of the United States, if the locality be, in the sense in which it is used by the common law judges in England, infra corpus comitatus. It is this point that we are now about to decide, and it is our wish that nothing which may be said in the course of our remarks shall be extended to embrace any other case of contested admiralty jurisdiction.
We do not think that either of the grounds taken can be maintained. But before giving our reasons for this conclusion, it will be well for us to state the cases in which the instance court in England exercised jurisdiction when our constitution was adopted.
In cases to enforce judgments of foreign admiralty courts, when the person or his goods are within the jurisdiction. Mariners' wages, except when the contract was under seal, or made out of the customary way of such contracts. Bottomry, in certain cases only, and under many restrictions. Salvage, when the property shipwrecked was not cast ashore. Cases between the several owners of ships, when they disputed among themselves about the policy or advantage of sending her upon a particular voyage. In cases of goods, and the proceeds of goods piratically taken, which will be arrested by a *453 warrant from the court, as belonging to the crown and as droits of the admiralty. And in cases of collision and injuries to property or persons on the high seas.
It may as well be said by us, at once, that, in cases of this last class, it has frequently been adjudicated in the English common law courts, since the restraining statutes of Richard II. and Henry IV. were passed, that high seas mean that portion of the sea which washes the open coast; and that any branch of the sea within the fauces terræ, where a man may reasonably discern from shore to shore, is, or at least may be, within the body of a county. In fact, the general rule in England has been, since the time of Lord Coke, upon the interpretation given by the courte of common law to the statutes 13 and 15 Richard II. and 2 Henry IV., to prohibit the admiralty from exercising jurisdiction in civil cases, or causes of action arising infra corpus comitatus. So sternly has the admiralty been excluded from what we believe to have been its ancient jurisdiction in England, that a prohibition within a few years has been issued in a case of collision happening between the Isle of Wight and the Hampshire coast; and a case of collision in the river Humber, twenty miles from the main sea, but within the flux and reflux of the tide, has been held not to be within the admiralty jurisdiction. The Public Opinion, 2 Hagg. 398.
It has not, however, been the undisputed rule, nor allowed to be the correct interpretation of the statutes of Richard. It has always been contended by the advocates of the admiralty, that ports, creeks, and rivers are within its jurisdiction, and not within those statutes; meaning that the ancient jurisdiction in such localities was not excluded by the words of the statutes. Browne, however, in his Civil and Admiralty Law, vol. 2, p. 92, thinks they were within the words of the statutes; not meaning, though, to affirm the declaration of Lord Coke, that those statutes were affirmative of the common law. We think they were not. However much every true English and American lawyer may feel himself indebted to the learning of that great lawyer, and will ever be cautious of disparaging it, it is difficult for any one to read and reflect upon the part which he took in the controversy upon admiralty jurisdiction in England, without assenting to Mr. Justice Buller's remarks, in Smart v. Wolf, 3 Durn. & East, 348:  "With respect to what is said relative to the admiralty jurisdiction in 4th Inst. 135 I think that part of Lord Coke's work has always been received with great caution, and frequently contradicted. He seems to have entertained not only a jealousy of, but an enmity against, that jurisdiction. The passage in 4th Inst. 135, disallowing the right to take stipulations, is expressly denied in 2 Lord Raym. 1826. And I may conclude with the words of Lord Holt in that case, that in this case `the admiralty had jurisdiction, and there is neither statute nor common law to restrain them.'"
*454 Having thus admitted, to the fullest extent, the locality in England within which the courts of common law permitted the admiralty to exercise jurisdiction in cases of collision, we return to the ground taken, that the same limitation is to be imposed, in like cases, upon the admiralty courts of the United States.
We have already said it cannot be maintained. It is opposed by general, and also by constitutional considerations, to which we have not heard an answer.
In the first place, those who framed the constitution, and the lawyers in America in that day, were familiar with a different and more extensive jurisdiction in most of the States when they were colonies, than was allowed in England, from the interpretation which was given by the common law courts to the restraining statutes of Richard II. and Henry IV. The commissions to the vice-admirals in the colonies in North America, insular and continental, contained a much larger jurisdiction than existed in England when they were granted. That to the governor of New Hampshire, investing him with the power of an admiralty judge, declares the jurisdiction to extend "throughout all and every the sea-shores, public streams, ports, fresh-water rivers, creeks and arms, as well of the sea as of the rivers and coasts whatsoever, of our said provinces."
In a work by Anthony Stokes, his Majesty's chief justice in Georgia, entitled, "A View of the Constitution of the British Colonies in North America and the West Indies," will be found, at page 166, the form of the commission of vice-admiral for the provinces in North America. He says, in page 150, the dates in the commission are arbitrary, and the name of any particular province is omitted. Its language is,  "And we do hereby remit and grant unto you, the aforesaid A.B., our power and authority in and throughout our province of ____ afore mentioned, &c. &c., and maritime ports whatsoever, of the same and thereto adjacent, and also throughout all and every of the sea-shores, public streams, ports, fresh-water rivers, creeks and arms, as well of the sea as of the rivers and coasts whatsoever, of our said province of F." The extracts from both commissions are the same. We have the authority of Chief Justice Stokes, that all given in the colonies were alike. The jurisdiction given in those commissions is as large as was exercised in the ancient practice in admiralty in England. It should be observed, too, that they were given long before any difficulties occurred between the mother country and ourselves; and that they contained no power complained of by us afterwards, when it was said an attempt was made to extend admiralty powers "beyond these ancient limits." The king's authority to grant those commissions in the colonies has never been, and cannot be, denied. In all the appeals taken from the colonial courts to the High Court of Admiralty in England, no such thing was ever intimated.
Was it not known, also, that, whilst the States were colonies, vice-admiralty *455 courts had been in all of them,  in some, as has just been said, by commissions from the crown, with additional powers conferred upon them by acts of Parliament; in others, by rights reserved in their charters, and in other colonies by their own legislation?  that, whether from either source, they exercised a jurisdiction over all maritime contracts, and over torts and injuries, as well in ports as upon the high seas?  that acts of Parliament recognized their jurisdiction as original maritime jurisdiction, in all seizures for contravention of the revenue laws?
Was not a larger jurisdiction in admiralty exercised in Massachusetts, throughout her whole colonial existence, than was permitted to the admiralty in England by the prohibitions of her common law courts? Were her members in the convention which formed our constitution ignorant of it?
Were the members from Pennsylvania and South Carolina forgetful, that the extent of the admiralty jurisdiction in the colonies had been the subject of judicial inquiry in England, growing out of proceedings in the admiralty courts of both of those States in revenue cases?  that it had been decided in 1754, in the case of the Vrow Dorothea, 2 Rob. 246,  which was an appeal from the vice-admiralty judge in South Carolina to the High Court of Admiralty, and thence to the delegates,  that the jurisdiction in admiralty in the colonies for a breach of the revenue laws was in its nature maritime, and was not a jurisdiction specially conferred by the statute of William III., ch. 22 § 6; a judgment which subsequently received the assent of all the common law judges, in a reference to them from the privy council? 2 Rob. 246; 8 Wheat. 397, note. This, too, after an eminent lawyer, Mr. West, assigned as counsel to the Commissioners of Trade and Plantations, had in 1720 expressed the opinion, that the statutes of 13 and 15 Richard II., ch. 3, and 2 Henry IV., ch. 11, and 27 Elizabeth, ch. 11, were not introductive of new laws, but only declarative of the common law, and were therefore of force in the plantations; and that none of the acts of trade and navigation gave the admiralty judges in the West Indies increase of jurisdiction beyond that exercised by the High Court of Admiralty at home.
Shall it be presumed, also, that the members of the convention were altogether disregardful of what had been the early legislation of several of the States, when they were colonies, upon admiralty jurisdiction and the rules for proceeding in such courts?  of the larger jurisdiction given by Virginia by her act of 1660, than was at that time allowed to the admiralty in England?  that it was passed in the year that the ordinance of the republican government in England expired by the restoration? That ordinance revived much of the ancient jurisdiction in admiralty. It was judicially acted upon in England for twelve years. When it expired there, the enlightened influences connected with trade and foreign commerce, "and *456 the uncertainty of jurisdiction in the trial of maritime causes," which led to its enactment, no doubt had their weight in inducing Virginia, then our leading colony in commerce, to adopt by legislation many of its provisions. That ordinance and the act of Virginia have, in our view, important bearings upon the point under consideration. They were well known to those who represented Virginia in the convention. In its proceedings, they had an active and intellectual agency, which makes it very unlikely that they were unmindful of the admiralty jurisdiction in Virginia. In New York, also, there was a court of admiralty, the proceedings of which were according to the course of the civil law. Maryland, too, had her admiralty, differing in jurisdiction from that of England.
Further, the proceedings of our Continental Congress in 1774 afford reasons for us to conclude that no such limitation was meant. The admiralty jurisdiction, ancient and circumscribed as it afterwards was in England, and as it was exercised in the colonies, was necessarily the subject of examination, when the Congress was preparing the declaration and resolves of the 14th October, 1774; in which it is said, "that the several acts of 4 George III., ch. 15, 34; 5 Geo. III., ch. 25; 6 Geo. III., ch. 52; 7 Geo. III., ch. 41; and 8 Geo. III., ch. 22, which impose duties for the purpose of raising a revenue in America, extend the power of the admiralty courts beyond their ancient limits." Journal of Congress, 1774, 21. Again, when it was said (Journal, 33), after reciting other grievances under the statute of 1767,  "And amidst the just fears and jealousies thereby occasioned, a statute was made in the next year (1768) to establish courts of admiralty on a new model, expressly for the end of more effectually recovering of the penalties and forfeitures inflicted by acts of Parliament, framed for the purpose of raising revenue in America." And again, in the address to the king (Journal, 47), it is said,  "By several acts of Parliament, made in the fourth, fifth, sixth, seventh, and eighth years of your Majesty's reign, duties are imposed upon us for the purpose of raising a revenue, and the powers of the admiralty and vice-admiralty courts are extended beyond their ancient limits; whereby our property is taken from us without our consent," &c. Why this repeated allusion to the ancient limits of admiralty jurisdiction, by men fully acquainted with every part of English jurisprudence, if they had not believed it had existed in England at one time much beyond what was at that time its exercise in her admiralty courts?
With these proceedings of the Continental Congress every member of the convention which framed the constitution was familiar. They knew, also, what had been the extent and the manner of the exercise of admiralty jurisdiction in the States, after the war began, until the articles of confederation had been ratified,  what it had been thence to the adoption of the constitution. Advised, as they were by personal experience, of the difficulties which attended the *457 separate exercise by the States of admiralty powers, before the confederation was formed, and afterwards from the restricted grant of judicial power in its articles, can it be supposed, in framing the constitution, when they were endeavouring to apply a remedy for those evils by getting the States to yield admiralty jurisdiction altogether to the United States, it was intended to circumscribe the larger jurisdiction existing in them to the limited cases, and those only then allowed in England to be cases of admiralty and maritime jurisdiction?  that the latter was exclusively intended, without any reference to the former, with which they were most familiar? Can it be reasonable to infer that such were the intentions of the framers of the constitution? Is it not more reasonable to say,  nay, may we not say it is certain,  that, in their discussions and thoughts upon the grant of admiralty jurisdiction, they mingled with what they knew were cases of admiralty jurisdiction in England what it actually was and had been in the States they were representing, with an enlarged comprehension of the controversy which had been carried on in England for more than two hundred years, between the judges of the common law courts and the admiralty, upon the subject of its jurisdiction? Besides, nothing can be found in the debates of the convention, nor in its proceedings, nor in the debates of the conventions in the States upon the constitution, to sanction such an idea. It is remarkable, too, that the words, "all cases of admiralty and maritime jurisdiction," as they now are in the constitution, were in the first plan of government submitted to the convention, and that in all subsequent proceedings and reports they were never changed. There was but one opinion concerning the grant, and that was, the necessity to give a power to the United States to relieve them from the difficulties which had arisen from the exercise of admiralty jurisdiction by the States separately. That would not have been accomplished, if it had been intended to limit the power to the few cases of which the English courts took cognizance.
But, besides what we have already said, there is, in our opinion, an unanswerable constitutional objection to the limitation of "all cases of admiralty and maritime jurisdiction," as it is expressed in the constitution, to the cases of admiralty and maritime jurisdiction in England when our constitution was adopted. To do so would make the latter a part and parcel of the constitution,  as much so as if those cases were written upon its face. It would take away from the courts of the United States the interpretation of what were cases of admiralty and maritime jurisdiction. It would be a denial to Congress of all legislation upon the subject. It would make, for all time to come, without an amendment of the constitution, that unalterable by any legislation of ours, which can at any time be changed by the Parliament of England,  a limitation which never could have been meant, and cannot be inferred from the words, which extend the jurisdiction of the courts of the United States "to all *458 cases of admiralty and maritime jurisdiction." One extension of the jurisdiction of the courts of the United States exists beyond the limitation proposed, just as it existed in the colonies before they became independent States, which never has been a case of admiralty jurisdiction in England. We mean seizures under the laws of impost, navigation, or trade of the United States, where the seizures are made on waters navigable from the sea by vessels of ten or more tons burden, within the respective districts of the courts, as well as upon the high seas. And this, we have shown in a previous part of this opinion, was decided in England as early as 1754, with the subsequent assent of the common law judges, not to be a jurisdiction conferred upon the courts of admiralty in the colonies by statutes, but was a case in the colonies of admiralty jurisdiction (2 Rob. 246). And so it is treated in the ninth section of the Judiciary Act of 1789. We cannot help thinking that section  a declaration by Congress contemporary with the adoption of the constitution  very decisive against the limitation contended for by counsel in this case. Again, this court decided, as early as 1805 (2 Cranch, 405), in the case of the Sally, that the forfeiture of a vessel, under the act of Congress against the slave-trade, was a case of admiralty and maritime jurisdiction, and not of common law. And so it had done before, in the case of the La Vengeance (3 Dall. 397). Again, Congress, by an act passed the 19th of June, 1813 (3 Stat. at Large, 2), declared that a vessel employed in a fishing voyage should be answerable for the fishermen's share of the fish caught, upon a contract made on land, in the same form and to the same effect as any other vessel is by law liable to be proceeded against for the wages of seamen or mariners in the merchant service. We shall cite no more, though we might do so, of legislative and judicial interpretations, to show that the admiralty jurisdiction of the courts of the United States is not confined to the cases of admiralty jurisdiction in England when the constitution was adopted.
No such interpretation has been permitted in respect to any other power in the constitution. In what aspect would it not be presented, if applied to the clause immediately preceding the grant of admiralty jurisdiction,  "to all cases affecting ambassadors, other ministers, and consuls"? Is that grant, too, to be interpreted by the jurisdiction which the English common law courts exercise in cases affecting those functionaries, or to be regulated by what Lord Coke says, in 4 Inst. 152, to be their liabilities to punishment for offences? Try the interpretation proposed by its application to the grant to Congress "to establish uniform laws on the subject of bankruptcies throughout the United States." Would it not result in this, that all the power which Congress had under that grant was the bankrupt system of England as it existed there when the constitution was adopted? Such a limitation upon that clause we deny. We think we may very safely say, such interpretations of *459 any grant in the constitution, or limitations upon those grants, according to any English legislation or judicial rule, cannot be permitted. At most, they furnish only analogies to aid us in our constitutional expositions. We therefore conclude, that the grant of admiralty power to the courts of the United States was not intended to be limited or to be interpreted by what were cases of admiralty jurisdiction in England when the constitution was adopted.
We will now consider the proposition, that the test against admiralty jurisdiction in England and the United States is the competency of a court of common law to give a remedy in a given case in a trial by jury; or that in all cases, except in seamen's wages, where the courts of common law have a concurrent jurisdiction with the admiralty, and can try the cause and give redress, that alone takes away the admiralty jurisdiction. It has the authority of Lord Coke to sustain it. But it was the effort and the design of Lord Coke to make locality the boundary in cases of contract, as well as in tort, that is, to limit the jurisdiction in admiralty to contracts made on the sea and to be executed on the sea; and to exclude its jurisdiction in all cases of marine contracts made on the land, though they related exclusively to marine services, principally to be executed on the sea. To that extent the admiralty courts were prohibited by the common law judges from exercising jurisdiction, until the unreasonableness and inconvenience of the restriction forced them to relax it in the case of seamen's wages. Then it was that the common law courts began to reflect upon what jurisdiction in admiralty rested, and upon the principles upon which it would attach. With the acknowledgment of all of them ever since, it was affirmed that the subject-matter, and not locality, determined the jurisdiction in cases of contract. Passing over intermediate decisions showing the manner and the reasons given for the relaxation in the one case, and the revival of the other, for which the admiralty always contended, we will cite the case of Menetone v. Gibbons, 3 Durn. & East, 269, 270. Lord Kenyon and Sir Francis Buller say, in that case, the question whether the admiralty has or has not jurisdiction depends upon the subject-matter. We wish it to be remarked, however, that the manner of proceeding is another affair, with which we do not meddle now.
It was only upon the principle that the subject-matter in cases of contract determined the jurisdiction, that this court decided the cases of The Aurora, 1 Wheat. 96, The General Smith, 4 Wheat. 438, and The St. Jago de Cuba, 9 Wheat. 409.
If, then, in both classes of civil cases of which the instance court has jurisdiction, subject-matter in the one class, and locality in the other, ascertains it, neither a jury trial nor the concurrent jurisdiction of the common law courts can be a test for jurisdiction in either class. Crimes, as well those of which the admiralty has jurisdiction as those of which it has not, except in cases of impeachment, the *460 constitution declares shall be tried by a jury. But there is no provision, as the constitution originally was, from which it can be inferred that civil causes in admiralty were to be tried by a jury, contrary to what the framers of the constitution knew was the mode of trial of issues of fact in the admiralty. We confess, then, we cannot see how they are to be embraced in the seventh amendment of the constitution, providing that in suits at common law the trial by jury should be preserved. Cases under twenty dollars are not so provided for. Does not the specification of amount show the class of suits meant in the amendment, if any thing could show it more conclusively than the term "suits at common law"?
Suits at common law are a distinct class, so recognized in the constitution, whether they be such as are concurrent with suits of which there is jurisdiction in admiralty, or not. Can concurrent jurisdiction imply exclusion of jurisdiction from tribunals, in cases admitted to have been cases in admiralty, without trial by jury? Again, suits at common law indicate a class, to distinguish them from suits in equity and admiralty; cases in admiralty another class distinguishable from both, as well as to the system of laws determining them as the manner of trial, except that in equity issues of fact may be sent to the common law courts for a trial by jury. Suppose, then, the seventh amendment of the constitution had not been made, suits at the common law and in admiralty would have been tried in the accustomed way of each. But an amendment is made, inhibiting any law from being passed which shall take away the right of trial by jury in suits at common law. Now by what rule of interpretation or by what course of reasoning can such a provision be converted into an inhibition upon the mode of trial of suits which are not exclusively suits at common law, recognized, too, as such by the constitution, for the trial of which Congress can establish courts which are not courts of common law, but courts of admiralty, without or with a jury, in its discretion, to try all issues of fact? Tried in either way, though, they are still cases in admiralty, and this power in Congress, under the grant of admiralty jurisdiction, to try issues of fact in it by jury, being as well known when the seventh amendment was made as it is now, is conclusive that it was done with reference to suits at common law alone. There is no escape from this result, unless it is to be implied that the amendments were proposed by persons careless or ignorant of the difference in the mode of trial of suits at common law and in admiralty. But they were not so, for we find some of them in Congress, a few months after, preparing and concurring in the enactment of a law, that the "trials of issues in fact in the District Courts, in all causes except civil causes of admiralty and maritime jurisdiction, shall be by jury."
In respect to the clause in the ninth section of the Judiciary Act,  "saving and reserving to suitors in all cases a common law remedy where the common law is competent to give it,"  we *461 remark, its meaning is, that in cases of concurrent jurisdiction in admiralty and common law, the jurisdiction in the latter is not taken away. The saving is for the benefit of suitors, plaintiff and defendant, when the plaintiff in a case of concurrent jurisdiction chooses to sue in the common law courts, so giving to himself and the defendant all the advantages which such tribunals can give to suitors in them. It certainly could not have been intended more for the benefit of the defendant than for the plaintiff, which would be the case if he could at his will force the plaintiff into a common law court, and in that way release himself and his property from all the responsibilities which a court of admiralty can impose upon both, as a security and indemnity for injuries of which a libellant may complain,  securities which a court of common law cannot give.
Having disposed of the objections to the jurisdiction of the courts of admiralty of the United States, growing out of the supposed limitation of them to the cases allowed in England and from the test of jury trial, we proceed to consider that objection to jurisdiction in this case, because the collision took place infra corpus comitatus. We have admitted the validity of this objection in England, but on the other hand it cannot be denied that the restriction there to cases of collision happening super altum mare, or without the fauces terr, was imposed by the statutes of Richard, contrary to what had been in England the ancient exercise of admiralty jurisdiction in ports and havens within the ebb and flow of the tide. We have seen no case, ancient or modern, from which it can correctly be inferred, that such exercise of jurisdiction was prohibited by mere force of the common law. The most that can be said in favor of the statutes of Richard being affirmative of the common law, are the assertions of Lord Coke and the prohibitions of the common law courts, subsequent to those statutes, and founded upon them, restricting the jurisdiction of the courts of admiralty to cases of collisions happening upon the high seas; contrary to what we have already said was its ancient jurisdiction in ports and havens in cases of torts and collision, and certainly in opposition to what was then, and still continues to be, the admiralty jurisdiction, in cases of collision, of every other country in Europe.
But giving to such prohibitions of the courts of common law the utmost authority claimed for them,  that is, that they are affirmances of the common law as interpretations of the statutes of Richard,  does it follow that they are to be taken as a rule in the admiralty courts of the United States in cases of collision? Must it not first be shown that the statutes of Richard were in force as such in America, and that the colonies considered and adopted that portion of the common law as applicable to their situation? Now, the statutes of Richard were never in force in any of the colonies, except as they were adopted by the legislation of some of them; and the common law only in its general principles, as they were applicable, *462 with such portions of it as were adopted by common consent in any one of the colonies, or by statute. This being so, the rule in England for collision cases being neither obligatory here by the statutes of Richard nor by the common law, we feel ourselves permitted to look beyond them, to ascertain what the locality is which gives jurisdiction to the courts of the United States in cases of collision or tort, or what makes the subject-matter of any service or undertaking a marine contract. Are we bound to say, because it has been so said by the common law courts in England in reference to the point under discussion, that sea always means high sea, or the main sea?  that the waters flowing from it into havens, ports, and rivers are not "parcel of the sea"?  that the fact of the political division of a country into counties makes it otherwise, and takes away the jurisdiction in admiralty, in respect to all the marine means of commerce and the injuries which may be done to vessels in their passage from the sea to their ports of destination, and in their outward-bound voyages until they are upon the high sea? Is there not a surer foundation for a correct ascertainment of the locality of marine jurisdiction in the general admiralty law, than the designation of it by the common law courts in England? Especially when the latter has in no instance been applied by England as a limitation upon the general admiralty law in any of her colonies; and when in all of them, until the act of 2 William IV., c. 51, was passed, the commissions gave to her vice-admirals jurisdiction "throughout all and every of the sea-shores, public streams, ports, fresh-water rivers, creeks and arms, as well of the sea as of the rivers and coasts whatsoever." Besides, the use of the word sea to fix admiralty jurisdiction, and what part of it might be within the body of a county, have not been settled points among the common law judges in England. Lord Hale differed from Lord Coke. The former, in defining what the sea is, says,  "that it is either that which lies within the body of the county or without; that-arm or branch of the sea which lies within the fauces terr is, or at least may be, within the body of a county; that part which lies not within the body of a county is called the main sea." It is difficult to reconcile the differences of opinion and of definition given by the common law courts in Lord Coke's day, and for fifty years afterwards, as to the meaning and legal application of the word sea, so as to make a practical rule to govern the decisions of cases, or to determine what were cases of admiralty jurisdiction. But there is no difficulty in making such a rule, if the construction of it, by the admiralty courts, is adopted. In that construction, it meant not only high sea, but arms of the sea, waters flowing from it into ports and havens, and as high upon rivers as the tide ebbs and flows. We think in the controversy between the courts of admiralty and common law, upon the subject of jurisdiction, that the former have the best of the argument; that they *463 maintain the jurisdiction for which they contend with more learning, more directness of purpose, and without any of that verbal subtilty which is found in the arguments of their adversaries. The conclusions of the admiralty, too, are more congenial with our geographical condition. We may very reasonably infer they were thought so on that account by the framers of the constitution when the judicial grant was expressed by them in the words,  "all cases of admiralty and maritime jurisdiction." In those words it is given by Congress to the courts, leaving to them the interpretation of what were such cases; as well the subject-matter which makes them so, as the locality which gives admiralty jurisdiction in cases of tort and collision. The grant, too, has been interpreted by this court in some cases of the first class, which leaves no doubt upon our minds as to the locality which gives jurisdiction in the other. We do not consider it an open question, but res adjudicata by this court. In Peyroux et al. v. Howard & Varion, 7 Pet. 342, the objection to the jurisdiction was overruled, upon the ground that the subject-matter of the service rendered was maritime, and performed within the ebb and flow of the tide, at New Orleans. The court say, although the current in the Mississippi at New Orleans may be so strong as not to be turned backward by the tide, yet if the effect of the tide upon the current is so great as to occasion a regular rise and fall of the water, it may properly be said to be within the ebb and flow of the tide. The material consideration is, whether the service is essentially a maritime service and to be performed on the sea or on tide water. In the case of The Steamboat Orleans v. Phbus, 11 Peters, 175, the jurisdiction of the court was denied, on the ground that the boat was not employed or intended to be employed in navigation and trade on the sea, or on tide waters. In Steamboat Jefferson; Johnson claimant, 10 Wheat. 428, this court says,  "In respect to contracts for the hire of seamen, the admiralty never pretended to claim, nor could it rightfully exercise, any jurisdiction, except in cases where the service was substantially performed, or to be performed, on the sea or upon waters within the ebb and flow of the tide. This is the prescribed limit, which it was not at liberty to transcend. We say, the service was to be substantially performed on the sea, or on tide water, because there is no doubt that the jurisdiction exists, although the commencement or termination of the voyage may happen to be at some place beyond the reach of the tide. The material consideration is, whether the service is essentially a maritime service. In the present case the voyage, not only in its commencement and termination, but in all its intermediate progress, was several hundred miles above the ebb and flow of the tide; and in no just sense can the wages be considered as earned in a maritime employment." In United States v. Coombs, 12 Pet. 72, where the question certified to the court directly involved what was *464 the admiralty jurisdiction, under the grant of "all cases of admiralty and maritime jurisdiction," the language of this court is,  "The question which arises is, What is the true nature and extent of the admiralty jurisdiction? Does it, in cases where it is dependent upon locality, reach beyond high-water mark? Our opinion is, that in cases purely dependent upon the locality of the act done, it is limited to the sea, and to tide waters, as far as the tide flows; and that it does not reach beyond high-water mark. It is the doctrine which has been repeatedly asserted by this court; and we see no reason to depart from it." Now, though none of the foregoing cases are cases of collision upon tide waters, but of contracts, services rendered essentially maritime, and in a case of wreck,  the point ruled in all of them, as to the jurisdiction of the court in tide water as far as the tide flows, was directly presented for decision in each of them. The locality of jurisdiction, then, having been ascertained, it must comprehend cases of collision happening in it. Our conclusion is, that the admiralty jurisdiction of the courts of the United States extends to tide waters, as far as the tide flows, though that may be infra corpus comitatus; that the case before us did happen where the tide ebbed and flowed infra corpus comitatus, and that the court has jurisdiction to decree upon the claim of the libellant for damages.
Before leaving this point, however, we desire to say that the ninth section of the Judiciary Act countenances all the conclusions which have been announced in this opinion. We look upon it as legislative action contemporary with the first being of the constitution, expressive of the opinion of some of its framers, that the grant of admiralty jurisdiction was to be interpreted by the courts in accordance with the acknowledged principles of general admiralty law. In that section the distinction is made between high seas and waters which are navigable from the sea by vessels of ten or more tons burden. Admiralty jurisdiction is given upon both, and though the latter is confined by the language to cases of seizure, it is so with the understanding that such cases were strictly of themselves within the admiralty jurisdiction. It declares that issues of fact in civil causes of admiralty and maritime jurisdiction shall not be tried by a jury, and makes so clear an assignment to the courts of jurisdiction in criminal, admiralty, and common law suits, that the two last cannot be so confounded as to place both of them under the seventh amendment of the constitution, which is,  "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise rëexamined, in any court of the United States, than according to the rules of the common law."
As to the merits of this case, as they are disclosed by the evidence, we think that the Luda was run down, whilst she was in the accustomed channel of upward navigation, by the De Soto, being *465 out of that for which she should have been steered to make the port to which she was bound. It is a fault which makes the defendants answerable for the losses sustained from the collision. That loss will not be more than compensated by the decree of the Circuit Court. We shall direct the decree to be affirmed.
There is a point in this case still untouched by us, which we will now decide. The libellants claim a recovery, independently of all the other evidence in the case, upon the single fact disclosed by it, that the collision happened whilst the De Soto was navigating the river at night without such signal lights as are required by the tenth section of the act of the 7th of July, 1838 (5 Stat. at Large, 304). It is entitled, "An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or part by steam." The tenth section of it declares,  "It shall be the duty of the master and owner of every steamboat, running between sunset and sunrise, to carry one or more signal lights, that may be seen by other boats navigating the same waters, under the penalty of two hundred dollars." This section, and the other provisions of the act, except as it has been changed by the act of 1843 (5 Stat. at Large, 626), apply to all steamers, whatever waters they may be navigated upon, within the United States or upon the coast of the same, between any of its ports. Signal lights at night are a proper precaution conducing to the safety of persons and property. The neglect of it, or of any other requirement of the statute, subjects the masters and owners of steamboats to a penalty of two hundred dollars, which may be recovered by suit or indictment (§ 11). But, besides the penalty, if such neglect or disobedience of the law shall be proved to exist when injury shall occur to persons or property, it would throw upon the master and owner of a steamboat by whom the law has been disregarded the burden of proof, to show that the injury done was not the consequence of it.
It is said, in this case, that the De Soto had not signal lights. Whether this be so or not, we do not determine; but it is certain, from some cause or other, that they were not seen by those navigating the Luda. If they had been, it is not improbable that the collision would have been avoided. We do not put our decision of this case, however, upon this ground, but we do say, if a collision occurs between steamers at night, and one of them has not signal lights, she will be held responsible for all losses until it is proved that the collision was not the consequence of it.
The act of July 7th, 1838, in all its provisions, is obligatory upon the owners and masters of steamers navigating the waters of the United States, whether navigating on waters within a State or between States, or waters running from one State into another State, or on the coast of the United States between the ports of the same State or different States.
*466 Mr. Justice CATRON.
The question here is, how far the judicial powers of the District Courts extend in cases of admiralty and maritime jurisdiction, as conferred by the constitution. With cases of prize, and cases growing out of the revenue laws, we have no concern at present. These depend on the general power conferred on the judiciary to try all cases arising under the laws of the United States. It is only with the extent of powers possessed by the District Courts, acting as instance courts of admiralty, we are dealing. The act of 1789 gives the entire constitutional power to determine "all civil causes of admiralty and maritime jurisdiction," leaving the courts to ascertain its limits, as cases may arise. And the precise case here is, whether jurisdiction exists to try a case of collision taking place on the Mississippi river, on fresh water slightly influenced by the pressure of tide from the ocean, but within the body of the State of Louisiana, and between vessels propelled by steam, and navigating that river only. It is an extreme case; still, its decision either way must govern all others taking place in the bays, harbours, inlets, and rivers of the United States where the tide flows; as the rule is, that locality gives jurisdiction in cases of collision, and that it exists if the influence of the tide is at all felt (2 Browne's Civil and Admiralty Law, 110; 7 Peters, 343). Where this collision occurred, the influence of the tide was felt.
We have, then, presented, simply and broadly, the question whether the District Courts, when acting as instance courts of admiralty, have power to try any case of collision occurring in the body of a county of any State.
In Great Britain, in 1776, when our separation from that country took place, the common law courts issued writs of prohibition to the Court of Admiralty, restraining the exercise of this jurisdiction in cases of collision taking place on rivers within the flow of tide, and within the body of an English county; but the admiralty has continued at times to exercise the jurisdiction, nor do I think the validity of such a decree could be called in question, because of the want of power. In the British colonies on this continent, and elsewhere, the jurisdiction to proceed in rem (in such a case) has been undisputed, so far as I can ascertain, and a cause of collision in the instance court of admiralty is peculiarly a suit in rem, commencing with the arrest of the ship. Abbott on Shipping, 233.
I agree with my dissenting brethren, that the constitution of the United States is an instrument and plan of government founded in the common law, and that to common law terms and principles we must refer for a true understanding of it, as a general rule having few exceptions; and so, also, to the common law modes of proceeding in the exercise of the judicial power we must refer as a general rule covering the whole ground of remedial justice to be administered by the national courts. To this there are two prominent *467 exceptions; first, the trial of cases in equity; and, secondly, of cases of admiralty and maritime jurisdiction. These may be tried according to the forms of the English chancery court, or the English admiralty court, and without the intervention of a jury. In chancery, the true limit of judicial power is prescribed by the sixteenth section of the Judiciary Act of 1789. The equity powers begin where the common law powers end, in affording an adequate remedy. So, in cases arising in bodies of counties (where the common law prevails) that would be cognizable in the admiralty had the cause of action arisen on the ocean, the English rule has been equally stringent in maintaining the common law remedies where they could afford plain and adequate relief. And I think the case before us must be tested by the foregoing principles. The proceeding is against the vessel, which the decree condemns; the case is the same as on a bottomry bond enforced against the vessel, or of a mortgage enforced in chancery. In neither case have the common law courts any power to afford relief, by enforcing the lien on the thing; still, the remedy at law, in case of the mortgage or the collision, is open to the injured party to proceed against the person; that is, of the debtor in the one case, and against the trespasser in the other. By the maritime law, the vessel doing the injury is liable in rem for the tort; this is the right, and the remedy must be found somewhere. Chancery has no power to interfere, nor have the common law courts any power to seize the vessel and condemn her; and it seems to me to be a strange anomaly, that where no other court can afford the particular relief, in a case confessedly within the admiralty jurisdiction if occurring on the ocean, that the power did not exist because the trespass took place in the body of a State and county.
I have thus briefly stated my reasons for sustaining admiralty jurisdiction in this instance, because of the divided opinions of the judges on the question; and because I do not intend to be committed to any views beyond those arising on the precise case before the court. I therefore concur that the jurisdiction exists. The facts in my judgment authorize the affirmance of the decree below.
WOODBURY, J., dissenting.
It is important to notice in the outset some unusual features in this case. The Supreme Court is called upon to try the facts as well as the law in it, and to decide them between parties in interest who belong to the same State, and as to a transaction which happened, not on the high seas, as is usual in torts under admiralty jurisdiction, but two hundred miles above the mouth of the Mississippi river, within the limits of a county, and in the heart of the State of Louisiana. A question of jurisdiction, therefore, arises in this, which is very important, and must first be disposed of. It *468 involves the trial by jury as to trespasses of every kind happening between the ocean and the head of tide-waters in all the numerous rivers of the United States, as well as the rights of the citizens near them, in such disputes with their neighbours, to be tried by their own local tribunals and their own laws, rather than be subject to the great inconvenience and expense of coming hither, at such a distance, and under a different code to vindicate their just claims. These interesting considerations in the case, and my differing in opinion on them from the majority of the court, will, it is hoped, prove a sufficient apology for justifying that difference in some detail.
A great principle at the foundation of our political system applies strongly to the present case, and is, that, while supporting all the powers clearly granted to the general government, we ought to forbear interfering with what has been reserved to the States, and, in cases of doubt, to follow where that principle leads, unless prevented by the overruling authority of high judicial decisions. So, under the influence of kindred considerations, in case of supposed improvements or increased convenience by changes of the law, it is an imperative duty on us to let them be made by representatives of the people and the States, through acts of Congress, rather than by judicial legislation. Paine's C.C. 75. Starting with these views, then, what is the character of the adjudged cases on the facts here to which they are to be applied?
Those to be found on the subject of torts through the collision of vessels are mostly of English origin, coming from a nation which is not only the source of much of our own jurisprudence, but entitled by her vast commerce to great respect in all matters of maritime usage and admiralty law. No principle appears to be better settled there than that the court of admiralty has not jurisdiction over torts, whether to person or property, unless committed on the high seas, and out of the limits of a county. 3 Bl. Com. 106; 4 Instit. 134; Doug. R. 13; 2 East's Crown Law, 803; Bac. Abr., Courts of Admiralty, A; 5 Rob. Ad. 345; Fitzh. Abr. 192, 416; 2 Dod. 83; 4 Rob. Ad. 60, 73; 2 Browne's Civ. and Ad. Law, 110, 204; 2 Hag. Ad. 398; 3 D. & E. 315; 3 Hag. Ad. 283, 369; 4 Instit. 136; Chamberlain et al. v. Chandler, 3 Mason's C.C. 244. This is not a doctrine which has grown up there since the adoption of our constitution, nor one obsolete and lost in the mist of antiquity; but it is laid down in two acts of Parliament as early as the fourteenth century, and has been adhered to uniformly since, except where modified within a few years by express statutes. The Public Opinion, 2 Hag. Ad. 398; 6 Dane's Abr. 341.
The first of these acts, the thirteenth of Richard II., declared that the admiralty must "not meddle henceforth of any thing done within the realm, but only of a thing done upon the sea." 3 Hag. Ad. 282; 1 Statutes at Large, 419. Then, in two years after, *469 to remove any doubts as to what was meant by the realm and the sea, came the fifteenth of Richard II., ordering, that of "things done within the bodies of counties, by land or water, the admirals shall have no cognizance, but they shall be tried by the law of the land." 2 Pickering's Statutes, 841. This gave to the common law courts there, and forbade to the admiralty, the trial of all collisions between vessels when not on the high seas, and not out of the body of a county, though on waters navigable and salt, and where strong tides ebbed and flowed. 2 Hag. Ad. 398; Selden on Dominion of the Sea, B. 2, ch. 14. And it did this originally, and continued to do it, not only down to the eighteenth century, but to our Revolution, and long since; because it was necessary to secure the highly prized trial by jury, rather than by a single judge, for every thing happening where a jury could be had from the vicinage of the occurrence within a county, and because it secured a decision on their rights by the highly prized common law, inherited from their fathers, and with which they were familiar, rather than by the civil law or any other foreign code, attempted to be forced upon the commons and barons by Norman conquerors or their partisans.
Among the cases in point as to this, both long before and since our Revolution, one of them, Velthasen v. Ormsley, 3 D. & E. 315, happened in A.D. 1789, the very year the constitution was adopted. See also Violet v. Blague, Cro. Jac. 514; 2 Hag. Ad. 398; 4 Instit. 134-138; 6 Dane's Abr. 341, Prohibition. And one of the most strenuous advocates for admiralty jurisdiction in Great Britain admits, that for damages done by the collision of ships, "if done at sea, remedy can be had in the admiralty, but not if it happen within the body of a county." 2 Browne's Civ. and Ad. Law, 111.
Since then, on his complaint, an express statute has been passed, 1 and 2 George IV., ch. 75, § 32, that any damage done by a foreign ship, "in any harbour, port, river, or creek," may be prosecuted either in admiralty or common law courts. The Christiana, 2 Hag. Ad. 184; 38 British Statutes, ch. 274. And, later still, a like change is considered by some to be made concerning injuries by domestic ships, under the 4 and 5 Victoria, ch. 45. See it in the Statutes at Large. But till these statutes, not a case of this kind can probably be found sustained in admiralty, even on the river Thames, at any place within the body of a county, though yearly covered with a large portion of the navigation of the world. See cases before cited, and 1 Dod. Ad. 468; 1 Wm. Rob. 47, 131, 182, 316, 371, 391, 474; Curtis's Admiralty, tit. Collision.
Nor is this a peculiarity in the admiralty system of that country confined to torts alone. But the same rule prevails as to crimes, and has always been adhered to, with a single exception, originally made in the statute itself of Richard, as to murder and mayhem committed in great vessels in the great rivers below the first bridges. *470 Com. Dig. Admiralty, E, 5, note; Hale's History of Common Law, 35; 3 Rob. Ad. 336; 4 Inst. 148; 1 Hawk. P.C., ch. 37, § 36; Palmer's Practice in House of Lords, 371, note.
The next inquiry is, if this distinction, confining the jurisdiction in admiralty over torts to such as happen on the high seas without the limits of a county, rested on such important principles as to be adopted in this country? Some seem disposed to believe it of so little consequence as hardly to have been worth attention. But this is a great mistake. The controversy was not in England, and is not here, a mere struggle between salt and fresh water,  sea and lake,  tide and ordinary current,  within a county and without,  as a technical matter only.
But there are imbedded beneath the surface three great questions of principle in connection with these topics, which possess the gravest constitutional character. And they can hardly be regarded as of little consequence here, and assuredly not less than they possessed abroad, where they involve, (1.) the abolition of the trial by jury over large tracts of country, (2.) the substitution there of the civil law and its forms for the common law and statutes of the States, (3.) and the encroachment widely on the jurisdiction of the tribunals of the State over disputes happening there between its own citizens.
Without intending to enter with any minuteness into the origin and history of admiralty jurisdiction abroad, it will be sufficient, in order to illustrate the vital importance of this question of locality, to say that the trial by jury and the common law, so ardently adhered to by the Anglo-Saxons, was soon encroached on after the Conquest by the Norman admirals claiming jurisdiction over certain maritime matters, not only on the ocean, and trying them without a jury, and on principles of their favorite civil law, but on the waters within the body of a county, and where a jury could easily be summoned, and where the principles of the common law had ever in England been accustomed to prevail. A struggle therefore, of course, soon sprung up in respect to this, as their monarchs had begun to organize an admiral's court within a century after the Conquest, but without any act of Parliament now found to vindicate it. See the Statutes at Large, and 3 Reeves's History of the English Law, 197. And laying down some regulations as to its powers by ordinances, as at Hastings, under Edward the First, but not by any acts of Parliament consulting the wishes of the barons and the commons. Whether this was constitutional or not, it was sufficient to make them look on the admiralty as a foreign and odious interloper. Reeves says (3 Reeves's Hist. of English Law, 137),  "The office of admiral is considered by the French as a piece of state invented by them." And whether it was imported thence by the conquerors, or originated with the Rhodians, or Romans, or Saracens, rather than the French or English, its principles seem to *471 have been transplanted to Western Europe from the Mediterranean, the cradle of commerce for all but the Asiatic world; and it was regarded by the commons and barons of England as an intruder into that realm, and without the sanction of Parliament.
In the course of a few years, that same sturdy spirit, which in Magna Charta was unwilling to let the laws of England be changed for a foreign code, proceeded, by the 13th and 15th of Richard II., to denounce and forbid the encroachments of the admirals, and their new forms and code of the civil law, into the bodies of counties and the local business of the realm. It produced those two memorable acts of Parliament, never since departed from in torts or crimes except under express statutes, and fixing the limit of jurisdiction for them at the line between the counties and the high seas. And they have ever since retained it there, except as above named, from the highest principles of safety to the common law, English liberties, and the inestimable trial by jury,  principles surely no less dear in a republic than a monarchy.
If the power of the admiral was permitted to act beyond that line, it was manifestly without the apology which existed thus far on the ocean, of there being no jury to be called from the vicinage to try the case. Prynne's Animadversions, 92, 93; Fitzh. Abr. 192, 216. And if the act, by an alias and a fiction, was alleged to be done in the county, when in fact it happened at a distance, on the seas, the jury would be less useful, not in truth residing near the place of the occurrence, not acquainted with the parties or witnesses, and the case itself not being one happening where the common law usually operated, and with which the people and the judges were familiar.
This last circumstance furnished another reason why the admiralty court was allowed there, and should be here, to continue to exercise some jurisdiction, beside their military and naval power, over the conduct of seamen and the business of navigation when foreign. Because such matters were connected with the ocean, with foreign intercourse, foreign laws, and foreign people, and it was desirable to have the law as to them uniform, and administered by those possessing some practical acquaintance with such subjects; they being, in short, matters extra-territorial, international, and peculiar in some degree to the great highway of nations. It is when thus confined to that great highway and its concerns, that admiralty law deserves the just tribute sometimes paid to it of expansive wisdom and elevated equity.[*] Then only there is an excellence in such regulations as to navigation over those for rights and duties on land; the last being often more for a single people, and their limited territory, while the former are on most matters more expanded, more liberal,  the gathered wisdom of and for *472 all maritime ages and nations. They are also what has been approved by all rather than a few, and for the territory of all in common. And hence that beautiful tribute paid to them by Antoninus, and just as beautiful, that he was "lord of the world, but Law the lord of the sea." 2 Browne's Civ. and Ad. Law, 38.
The sea being common to all nations, its police and the rights and duties on it should be governed mainly by one code, known to all, and worthy to be respected and enforced by all. This, it will be seen, indicates in letters of strong light the very line of boundary which we have been attempting to draw, on grounds of deep principle, here as well as in England. It is the line between State territory and State laws on the one hand, and the ocean, the territory of all nations, and the laws of all nations, the admiralty and sea laws of all nations, on the other hand, leaving with those, for instance, residing within local jurisdictions, and doing business there, the local laws and local tribunals, but with those whose home and business are on the ocean the forms and laws and tribunals which are more familiar to them. This line being thus a certain and fixed one, and resting on sound principles, has in England withstood the shock of ages. It is true, that some modifications have been recently made there, but only by express statutes, and carefully guarded so as not to innovate on the common law and the trial by jury. That this line of distinction was in fact appreciated quite as highly here as in England is shown by various circumstances that need not be repeated; but among them were solemn resolutions of the old Congress against acts concerning trade and revenue, extending the power of admiralty courts beyond their ancient limits, and thus taking away the trial by jury. 1 Journal, 19, 20. And as a striking evidence of the dangerous importance attached to this outrage, it was remarked in the convention of North Carolina, that "the Stamp Act and the taking away of the trial by jury were the principal causes of resistance to Great Britain." 4 Elliot's Deb. 157. Indeed, this same jealousy of the civil law, and its mode of proceeding without a jury, led, in the first legislation by Congress, to forbid going into chancery at all, if relief at law is as ample and appropriate. See sixteenth section of Judiciary Act, 1 Statutes at Large, 83. So as to admiralty, a statute of Pennsylvania, passed during the Revolution, allowed it only in cases "not cognizable at common law." 1 Dall. 106. And our fathers never could have meant, that parties, for matters happening within a county or State, should be dragged into admiralty any more than equity, if as full a remedy, and of as good a kind, existed in courts of law, where they could enjoy their favorite code and mode of trial. 1 Bald. C.C. 405. This would leave much to admiralty still, as well as to equity, and more especially in the former, by proceedings in rem. And when it became convenient to vest additional power in the same court, or power over a wider range of territory, as it *473 might in the progress of society and business, it could be done here by express statute, as it has been in respéct to the Lakes, under the power to regulate commerce, and allowing a trial by jury if desired.
In short, instead of less, much additional importance should be attached to this line of distinction here, beyond what exists in England; because it involves here not only all the important consequences it does there, but some which are new and peculiar. Instead of being, as it once was there, a contest between courts of one and the same government, it may become here a struggle for jurisdiction between courts of the States and courts of the United States, always delicate, and frequently endangering the harmony of our political system. And while the result there, in favor of the admiralty, would cause no additional inconvenience and expense, as all the courts sit in one city, such a result here compels the parties to travel beyond their own counties or States, and in case of appeal to come hither, a distance sometimes of a thousand or fifteen hundred miles.
Admitting, then, as we must, that the doctrine I have laid down as to torts was the established law in England at our Revolution, and was not a mere technical doctrine, but rested on great principles, dear to the subject and his rights and liberties, should it not be considered as the guide here, except where altered, if at all, by our colonial laws or constitutions, or acts of Congress, or analogies which are binding, or something in it entirely unsuitable to our condition? The best authorities require that it should be. 1 Peters's Ad. 116, 236, note; 1 Peters's C.C. 104, 111-114; 1 Paine's C.C. 111; 2 Gall. 398, 471; 3 Mason, 27; Bemis v. The Janus et al., 1 Baldwin's C.C. 545; 12 Wheat. 638; 1 Kent's Com. 377; 4 Dall. 429; 4 Wash. C.C. 213. Yet this is contested in the present case.
Some argue that the constitution, by extending the judicial power to "all cases of admiralty and maritime jurisdiction," meant cases different from those recognized in England as belonging to the admiralty at the Revolution, or those as modified by ourselves when colonies. These jurists stand prominent, and their views seem to-day adopted by a portion of this court. See the argument in De Lovio v. Boit, 2 Gall. 398.
The authorities which I have cited against this position seem to me overwhelming in number and strength; and some of them come from those either engaged in making the constitution, or in construing it in the earliest stages of its operation. Let me ask, What books had we for admiralty law, then, as well as common law,  both referred to in the constitution,  but almost exclusively English ones? What had the profession here been educated to administer,  English or French admiralty? Surely the former. The judges here were English, the colonies English, and appeals, in all cases on the instance side of the court, lay to the English admiralty at home.
*474 What "cases of admiralty," then, were most likely to be in the minds of those who incorporated those words into the constitution?  cases in the English reports, or those in Spain, or Turkey?  cases living and daily cited and practised on both in England and here, or those in foreign and dead languages, found in the assizes of Jerusalem near the time of the Crusades?
It is inferred by some, from 6 Dane's Abr. 352, 353, that cases in admiralty are to be ascertained, not by English law at the Revolution, but by principles of "general law." And Judge Washington held, it is said, we must go to the general maritime law of the world, and not to England alone. Dain et al. v. Sloop Severn, 4 Hazard's Penn. Reg. 248, in 1828. But the whole tenor of Mr. Dane's quotations and reasons, in respect to admiralty jurisdiction, is to place it on the English basis; and Judge Washington, in several instances, took it for his guide, and commended it as the legal guide. In the United States v. Gill, 4 Dall. 429, he says:  "But still the question recurs, Is this a case of admiralty and maritime jurisdiction within the meaning of the constitution? The words of the constitution must be taken to refer to the admiralty and maritime jurisdiction of England, from whose code and practice we derived our systems of jurisprudence, and, generally speaking, obtain the best glossary." See also 4 Wash. 456, 457.
Neither of these eminent jurists was ever likely to go to the laws of Continental Europe as guides, unless in cases not well settled either here or in England, and then, as in the common law courts and in chancery, they might properly search all enlightened systems of jurisprudence for suggestions and principles to aid. Chancellor Kent, also, with his accustomed modesty, yet with clearness, supporting a like doctrine with that just quoted from Judge Washington, observes,  "But I apprehend it may fairly be doubted, whether the constitution of the United States meant, by admiralty and maritime jurisdiction, any thing more than that jurisdiction which was settled and in practice in this country under the English jurisprudence when the constitution was made." 1 Kent's Com. 377. Another strong proof that this was the opinion prevailing here at that time is, that a court of admiralty was established in Virginia, in 1779, under the recommendation of Congress to all the States to make prize courts; and, by the act of Assembly, it is expressly provided that they are to be "governed in their proceedings and decisions by the regulations of the Congress of the United States of America, by the acts of the General Assembly, by the laws of Oleron, and the Rhodian and Imperial laws, so far as they have been heretofore observed in the English courts of admiralty, and by the laws of nature and nations." 10 Hening's Stat. 98. They thus, after our own laws, State and national, made England the guide.
It is said by others, appealing to feelings of national pride, that we are to look to our own constitution and laws, and not to England, *475 for a guide. So we do look to our own laws and constitution first, and when they are silent go elsewhere. But what are our own laws and constitution, unless those in England before our Revolution, except so far as altered here, either before, or then, or since, and except such in England then as were not applicable to our condition and form of government? This was the guide adopted by this court in its practice as early as August 8th, 1791 (1 Howard, 24), and as late as January, 1842, it treated the practice in England as the rule in equity, where not otherwise directed; and in Gaines et al. v. Relf et al., 15 Peters, 9, it decided that when our own "rules do not apply, the practice of the Circuit and District Courts must be regulated by the practice of the court of chancery in England." See, also, Vattier v. Hinde, 7 Peters, 274. And most of its forms and rules in admiralty have been adopted in our District and Circuit Courts. See Rule XC., in 1 How. 66, Pref. And this court has again and again disposed of important admiralty questions, looking to England alone, rather than the Continent, as a guide when they differed.
Thus the Continental law would carry admiralty jurisdiction over all navigable streams. Yet this court has deliberately refused to do it, in The Thomas Jefferson, 10 Wheat. 428. Had it not so refused, in repeated instances, there would have been no necessity for the recent act of Congress as to the Lakes and their tributaries. So, the civil law gives a lien for repairs of domestic ships; but this court has not felt justified in doing it without a statute, because not done in England. 7 Peters, 324. And in Hobart v. Drogan et al., 10 Peters, 122, this court felt bound to follow the English decisions as to salvage, though in some respects harsh. See, also, 3 Howard, 568.
So, when the constitution and the acts of Congress speak, as they do in several instances, of the "common law," do they not mean the English common law? This court so decided in Robinson v. Campbell, 3 Wheat. 223, adhering, it said, "to the principles of common law and equity, as distinguished and defined in that country, from which we derive our knowledge of those principles." Why not, then, mean the English admiralty law when they speak of "cases of admiralty and maritime jurisdiction"? They of course must, by all analogous decisions and by established usage, as well as by the opinions of eminent jurists. The English decisions furnish, also, the most natural, appropriate, uniform, and well-known principles, both for action and judicial decision.
It would be extraordinary, indeed, for this court to undertake to exercise a legislative power as to this point, and without warrant to search the world over and select, for the trial of private rights, any law they may prefer. On the contrary, its duty rather is to declare the law which has already become ours, which we inherited from our ancestors or have enacted ourselves, and which is not vagrant *476 and uncertain, but to be found in our own judicial history and institutions, our own constitution, acts of Congress, and binding precedents. Congress also might, in many instances, perhaps, make the law better than it is, and mould it so as to meet new exigencies in society, and suit different stages of business and civilization; and, by new laws as to navigable waters, judicial tribunals, and various other matters, is yearly doing this. But does this court possess that legislative power? And if Congress chooses to give additional jurisdiction to the District Court on the Lakes, or tide-waters, or navigable streams between them, and allow jury trials when desired, under its power to regulate commerce and collect a revenue, will this not answer every valuable purpose, and supply any new want or fancied improvement in a more satisfactory and more constitutional manner than for courts to do it without consulting Congress?
That Congress possess the power to do this cannot be plausibly questioned. The late law as to jurisdiction over the Lakes, which is given to the District Court, but not as an admiralty case under the constitution, and with a jury when desired, is a strong illustration of legislative opinion being the way we contend.
Any expansion or enlargement can be thus made, and by withdrawing in part the jurisdiction now conferred on the District Courts in any matters in admiralty, Congress can also abridge the exercise of it as experience and time may show to be wise. For this reason, we are unable to see the force of the argument just offered by four members of this court, that if the English admiralty law was referred to in the expression of "all cases of admiralty and maritime jurisdiction," no change in it could be made, without being at the trouble and expense of altering the constitution.
But in further answer to this, let me ask if the constitution, as they contend, was meant to include cases in admiralty as on the Continent of Europe rather than in England, could the law as to them be more easily altered than if it was only the law of England? And would it not take the interpretation of the admiralty law as much from the courts in one case as in the other?
It is conceded, next, that legislation has, in some respects, in England, since 1789, changed and improved her admiralty proceedings; but this only furnishes additional evidence that the law was different when our constitution was framed, and that these changes, when useful and made at all, should be made by legislation and not by judicial construction, and they can rightfully have no force here till so made. United States v. Paul, 6 Peters, 141. The difference, too, between a change by Congress and by this court alone is, furthermore, that the former, when making it, can and doubtless will allow a trial by jury, while we are unable to do this, if we make the change by construing the case to be one legitimately of admiralty jurisdiction.
Finally, then, the law, as it existed in England at the time of the *477 Revolution, as to admiralty jurisdiction over torts, is the only certain and safe guide, unless it has been clearly changed in this respect, either by the constitution, or acts of Congress, or some colonial authority. We have already seen that the constitution has not used words which are fairly open to the idea that any such change was intended. Nor has it made any alteration in terms as to torts. And no act of Congress has introduced any change in respect to torts, having in this respect merely conferred on the District Courts cognizance of "all civil cases" in admiralty, without in a single instance defining what shall be such cases in connection with torts. The next inquiry, then, is, whether the colonies changed the law as to the locality of torts, and exercised jurisdiction over them in admiralty, though committed within a county and not on the high seas.
I am compelled to go into these details more than would otherwise be done, considering their tediousness, on account of the great reliance on them in one of the opinions just read. In order to operate on the point under consideration, it will be seen that any colonial change must have been so clear and universal as to have been referred to in the constitution and the act of Congress of 1789, and to be the meaning intended by their makers to be embraced in the expression of "cases of admiralty and maritime jurisdiction," rather than the meaning that had usually been attached to them by the English language and the judicial tribunals of England, for centuries. And this change, likewise, must have been clearly meant to be referred to and adopted, notwithstanding its great encroachment in torts on the boasted trial by jury, and which encroachment they were denouncing as tyranny in other cases, and notwithstanding its natural consequences would be new collisions with the powers of the State tribunals, which they were most anxious to avoid. I have searched in vain to find acts of assembly in any of the thirteen colonies, before 1776, making such a change, much less in a majority or all of them. Nor can I find any such judicial decisions by vice-admiralty courts in any of them, much less in all. Nor is it pretended that any acts of Parliament or judgments in the courts in England had prescribed a different rule in torts for the colonies from what prevailed at home.
It would be difficult, then, to show that a law had become changed in any free country, except by evidence contained in its legislation, or constitutions, or judicial decisions. But some persons, and among them a portion of this bench, have referred to commissions of office to vice-admirals as evidence of a change here; and some, it is feared, have been misled by them. 1 Kent's Com. 367, note; 2 Gall. 373.
These commissions, in the largest view, only indicated what might be done, not what was actually afterwards done under them. In the next place, all must see, on reflection, that a commission issued by the king could not repeal or alter the established laws of the land.
*478 Beside the forms of some of these commissions, referred to in De Lovio v. Boit (2 Gall. 398), an entire copy of one of them is in Stokes, and another in Duponceau on Jurisdiction, p. 158, and in Woodcock's Laws of the British Colonies, p. 66. It will be seen that they are much alike, and though there are expressions in them broad enough to cover all "fresh waters" and "rivers," and even "banks of any of the same" (Woodcock, 69), yet tide-waters are never named as the limit of jurisdiction; and, over and paramount to the whole, the judge is required to keep and cause to be executed there "the rights, statutes, laws, ordinances, and customs anciently observed." Where anciently observed? In England, of course; and thus, of course, were to comply with the English statutes and decisions as to admiralty matters.
This limitation is inserted several times, from abundant caution, in the commission in Woodcock, 66, 67, 69.
But beside these conflicting features in different parts of them, the commissions of vice-admirals here seem, in most respects, copies of mere forms of ancient date in England (Woodcock's Brit. Col. 123), and, of course, were never intended to be used in the colonies as alterations of the laws, and were, as all know, void and obsolete in England when differing from positive statutes. So virtually it was held in the colonies themselves. The Little Joe, Stewart's Ad. R. 405; and The Apollo, 1 Hag. Ad. 312; Woodcock's Laws and Const. of the Colonies, 123. These commissions, also, if they prove any thing here actually done different from the laws in England, except what was made different by express statute, as to matters connected with breaches of the laws of revenue and trade, and not as to torts, prove quite too much, as they go above tide-water and even on the land.
But it is not believed that they led to any practices under them here different from the laws at home in respect to torts. None can now be found stated, either in reports of cases or contemporaneous history. Probably in the colonies the same rules as at home prevailed on this, for another reason; because no statute was passed as to torts here, and appeals to the admiralty at home existed, on the instance side of the court, till a recent change, so as to preserve uniformity in the colonies and at home. Bains v. The James, Baldw. 549; Woodcock, 242. A case of one of those appeals is reported in 2 Rob. 248, 249, The Fabius. There the enlarged powers conferred on vice-admiralty-courts by the 6 and 7 of William III., as to seizures and prosecutions for breaches of the laws of trade and revenue, are not, as I understand the case, considered admiralty powers, and we all know they were not so per se or proprio vigore. A looser practice in the colonies, but no difference of principle, except under statute, appears to have been tolerated. Woodcock's Laws, &c., 273.
In accordance with this, Tucker, in his Appendix to Part I. *479 of 1 Black. Com. 432, after a careful examination of charters and other documents, comes to the conclusion, that the laws at home before emigration, both statute and common law, so far as applicable to the condition of the colonies, and in favor of life, liberty, and property of the subject, "remained in full force therein until repealed, altered, or amended by the legislative authority of the colonies respectively, or by the constitutional acts of the same when they became sovereign and independent states." See, also, to this effect, Montgomery v. Henry, 1 Dall. 49; 1 Chalmers's Op. 195; Woodcock, 156. But what seems to settle this inquiry is the treatise of a colonial judge, giving some data on this very subject, and of course well informed on the subject. Stokes's View of Constitution of British Colonies (p. 270) contains or account of the admiralty jurisdiction in the colonies before the Revolution.
Two things are clearly to be inferred from him:  1st. That admiralty and maritime cases extended only to matters "arising on the high seas"; and, 2d. That the practice and rules of decision in admiralty were the same here as in England.
Thus, in chapter 13, page 271, he says:  "In the first place, as to the jurisdiction exercised in the court of vice-admiralty in the colonies, in deciding all maritime causes, or causes arising on the high seas, I have only to observe, that it proceeds in the same manner that the High Court of Admiralty in England does." "The only book that I have met with, which treats of the practice of the High Court of Admiralty in England, is Clarke's Praxis Admiralitatis, and this is the book used by the practitioners in the colonies."[*]
In connection with this, all the admiralty reports we have of cases before the Revolution, and of cases between 1776 and 1789, seem to corroborate the same view, and are worth more to show the actual jurisdiction here than hundreds of old commissions containing obsolete powers never enforced. There is a manuscript volume of Auchmuty's decisions made in the vice-admiralty court in Massachusetts, about 1740. (See Curtis's Merchant Seamen, 348, note). It will be difficult to find in them, even in one colony, much more in the thirteen, clear evidence of any change here, before the Revolution, in respect to the law concerning the locality of torts.
The very first case of Quitteville v. Woodbury, April 15, 1740, is a libel for a trespass. But it is carefully averred to have taken place "at the Bay of Hondurus, upon the open sea, on board the ship King George."
*480 No other case of tort is printed, and on a careful examination of what has not been printed no case is found varying the principle. There is one for conversion of a vessel and cargo, July 30th, 1742, tried before George Cradock, deputy judge in admiralty, Farrington v. Dennis. But the conversion happened on the high seas, or what in those days was often termed the "deep sea." So a decision in the State of Delaware, in 1788, reported in the Introduction to 4 Dall. 2 (last edit.); the judge seems to concede it to be law in that colony, that all cases, except prize ones, must happen "on the high seas" in order to give the admiralty jurisdiction over them.
So a few cases before the adoption of the constitution are reported in Bee's Admiralty Decisions, though they are mostly on contracts. But they all make a merit of conforming to the course in the English admiralty, rather than exhibiting departures from and enlargements of its jurisdiction. See one in A.D. 1781, Bee's Adm. 425, and another in the same year (p. 419), and another in 1785 (p. 369). But the most decisive of all is a case in A.D. 1780, in the High Court of Appeals in Pennsylvania, Montgomery v. Henry et al., 1 Dall. 49.
It was a proceeding in admiralty, regarded by some as sounding in tort, and by some in contract; but as to the line of jurisdiction, this having happened, as averred, on the river Delaware, the court say, through Reed, their president,  "But it appears to us, that from the 13th and 15th Richard II. the admiralty has had jurisdiction on all waters out of the body of the county. There has been great debate as to what is meant by high seas. A road, haven, or even river, not within the body of the county, is high sea in the idea of civilians. Therefore, if the river Delaware is out of the body of any county, we think it clear that it is within the admiralty jurisdiction."
In short, as to this matter the first principles of English jurisprudence, as applicable to her colonies, show that there could be no difference here on a matter of this kind, unless authorized by express statute at home, extending to the colonies, or by acts of assembly here, expressly sanctioned at home.
Blackstone says,  "For it hath been held, that if an uninhabited country be discovered and planted by English subjects, all the English laws then in being, which are the birthright of every subject, are immediately there in force." 1 Bl. Com. 108; 2 P. Wms. 75. Exceptions of course exist as to matters not applicable to their condition, but none of them reach this case, and require consideration.
Were not we then British colonies, and beginning here in an uninhabited country, or, what is equivalent, tenanted by a people not having any civilized laws? Why, then, were not the principles of English admiralty law in force here in the vice-admiralty courts, as *481 much as the English common law in other courts,  and which has been declared by this tribunal to have been the basis of the jurisprudence of all the States in 1789? 3 Peters, 444. Indeed, any laws in the plantations contrary to or repugnant to English laws were held to be void, if not allowed by Parliament at home. 3 Bl. Com. 109, App. 380, by Tucker.
What is left, then, for the idea to rest on of a change in respect to the locality of torts here, to give admiralty courts jurisdiction over them different from what existed in England in 1776? We have already seen that there is nothing in the constitution, nothing in any acts of Congress, nothing in any colonial laws, or colonial decisions in the vice-admiralty courts. Some venture to infer it merely from analogies. But denying the competency for courts of limited jurisdiction, like ours, to do this, if impairing jury trials and encroaching on State jurisdictions, without any express grant or authority to that effect, let me ask, what are the analogies? The only ones which can be imagined are cases of crimes, contracts, and seizures for breaches of laws of revenue and trade. But the decisions as to crimes prove directly the reverse.
In respect to them, no change whatever on this point has occurred, and the rule recognized in this country as the true one concerning their locality is, like that in England, if tried in admiralty as being crimes by admiralty law, they must have been committed without the limits of a county or State. 4 Mason, C.C. 308; 5 ibid. 290; 1 Dall. 49; 3 Wheat. 336, 371; 5 ibid. 76, 379; 12 ibid. 623; 4 Wash. C.C. 375; Baldw. C.C. 35.
And all crimes on the waters of the United States made punishable in the courts of the United States, by acts of Congress, with few or no exceptions, if connected solely with admiralty jurisdiction, are scrupulously required to have been committed on the sea or the high seas, "out of the jurisdiction of any particular State."
In all criminal cases in admiralty in England, the trial has also been by jury, by an express act of Parliament, ever since the 32 Henry VIII. (Com. Dig., Admiralty), and so far from the same principle not being considered in force here, the constitution itself, before any amendments, expressly provided for all criminal trials of every kind being by a jury. Art. 3, § 2, and Federalist, No. 81.
So, the old Confederation (Article 9th) authorized Congress to provide courts for the trial "of piracies and felonies committed on the high seas." 1 Laws (Bioren's edit.), p. 16. And when Congress did so, they thought it expedient to adopt the same mode of trial for acts "on the sea" as on the land, and "according to the course of the common law"; and under a sort of mixed commission, as under the 28 Henry VIII., to try these offences, consisting of the justices of the Supreme Court in each State, united with the admiralty judge, they imperatively required the use of a jury. 7 Journ. of Old Cong. 65; Duponceau on Juris. 94, 95, note.
*482 Finding, then, that any analogy from crimes directly opposes, rather than favors, any change as to torts, let us proceed to the case of contracts. It will be necessary, before they can be allowed any effect, for their friends to show, that the locality of contracts has been changed here, and then that such change should operate on torts. Contracts, in one aspect of the subject, did not differ as to their locality from torts and crimes before Richard II. any more than after.
But as the question in relation to the locality of contracts here is still undecided, and is before this court awaiting another argument, on account of divisions of opinion among its members in respect to it, no analogy can be drawn to govern other questions from what is itself thus uncertain; and it is not deemed decorous by me to discuss here the moot question as to contracts, or, till the other action pending in relation to them is itself settled, to draw any inference from what I may suppose to be, or not to be, their locality.
Without, then, going farther into the subtilties as to the locality or want of locality of contracts within admiralty jurisdiction, so fully discussed in 2 Gallison, 475, by Judge Story, on the one hand, and in 12 Wheaton, 622, by Justice Johnson, on the other, as well as in the case of the Lexington, at this term, it is enough to say, that is not the question now under consideration. It is, at the nearest, but collateral, and differently situated. For in trespass it was always a test, not only that it happened on the sea, instead of merely tide-water, but out of the body of a county.
And above all this, those very writers who contend that locality does not govern the jurisdiction over contracts admit that it controls, and always has controlled, the right to try both torts and crimes (with the exceptions before named, and not influencing this question), during all the fluctuations and struggles about contracts during the last four hundred years.
In the resolutions said to have been prepared by the judges in 1632, with a view to arrange differences concerning jurisdiction, no change or modification is made as to torts. Dunlap's Prac. 13, 14; Bevans's case, 3 Wheat. 365, note.
Nor was there any in the mutual arrangement between the different courts in 1575. See it, in 3 Wheat. 367, note; Prynne's Animadversions, 98, 99. And in Crowell's Ordinance of 1648, on the jurisdiction of the admiralty, so much relied on by those friendly to the extension of it, and by some supposed to have been copied and followed in this country, damages by one ship to another were included, but it was meant damages on the sea, being described as "damages happening thereon, or arising at sea in any way." Dunlap's Ad. 16.
Hence, even in admiralty writers and admiralty courts, it is laid down repeatedly, "in torts, locality ascertains the judicial powers." And again, "in all matters of tort, locality is the strict limit." 2 Bro. Civ. and Ad. Law, 110. So in The Eleanor, 6 Rob. Ad. 40, *483 Lord Stowell said, "the locality is every thing," instead of holding it to be an obsolete or immaterial form.
Lastly, in respect to analogies in seizures for breaches of the laws of revenue and trade, it is claimed that some change has occurred there, which should influence the jurisdiction over torts. But these seizures are not for torts, nor has the change in relation to the trial of them happened on any principle applicable to torts. Moreover, it has been made as to seizures only under express statutes, and the construction put on those statutes; and if this is to be followed by analogy, no change can be made as to torts except by express statutes.
But there has never been any such statute as to them, and if without it the change was made by analogy, tide-waters would not be the test, as is here contended, but, like cases of seizures, any waters navigable by a boat of ten tons burden. It is even a matter of very grave doubt, whether a mistake was not committed in refusing a trial by jury in cases of seizure, under our Judiciary Act, whenever desired, or at least whenever not made on the high seas. Kent, Dane, and several others, think the early decisions made on this, and which have since been merely copied, were probably erroneous. 1 Kent's Com. 376; 6 Dane, 357.
So thought Congress, likewise, when, Feb. 13th, 1801 (sec. 11th), it conferred on the Circuit Court jurisdiction over "all seizures on land or water, and all penalties and forfeitures made, arising, or accruing under the laws of the United States." This was original cognizance, though not in a court of admiralty, and properly treated seizures on water as on land, and to be all of course tried by a jury. 2 Stat. at Large, 92. This was a change made by Congress itself, aided by some of the first lawyers in the country. But as the whole statute was repealed, on account of the obnoxious circumstances as to the judges under which it was passed, all the changes fell with it.
The admiralty in England did not exercise any jurisdiction over seizures for revenue, though on the ocean. 8 Wheat. 396, note. But it was in the court of exchequer, and was devolved on admiralty courts in the colonies for convenience, as no court of exchequer existed there. Duponceau's Jurisdiction, 139, and note. This additional jurisdiction, however, was not an admiralty one, and ought to have been used with a jury, if desired, as in the exchequer. Powers not admiralty are for convenience still devolved on admiralty courts; and it was a great grievance, complained of by our ancestors here, that such a trial was not allowed in such cases before the Revolution. Undoubtedly it was the expectation of most of those who voted for the act of 1789, that the trial by jury would not be here withheld in cases of seizures for breach of laws of the revenue, which they had always insisted on as their constitutional right as Englishmen, and, a fortiori, as Americans.
*484 They had remonstrated early and late, and complained of this abridgment of the trial by jury even in the Declaration of Independence, and as one prominent cause and justification of the Revolution. 1 Journal of Old Congress, 45; 6 Dane's Abr. 357; Baldw. C.C. 551. As plenary evidence of this, it is necessary to quote here but a single document, as that was drawn up by John Jay, afterwards the chief justice of this court. It is the address by the old Congress, October 21st, 1774, to the people of Great Britain, and among other grievances says,  "It was ordained, that whenever offences should be committed in the colonies against particular acts imposing duties and restrictions upon trade, the prosecutor might bring his action for the penalties in the courts of admiralty; by which means the subject lost the advantage of being tried by an honest, uninfluenced jury of the vicinage, and was subjected to the sad necessity of being judged by a single man,  a creature of the crown,  and according to the course of a law (civil) which exempts the prosecutor from the trouble of proving his accusation, and obliges the defendant either to evince his innocence or to suffer."
Now, after these reprobations of such a practice,  after two specific amendments to the constitution to secure the trial by jury in cases before doubtful,  and after three clauses in the Judiciary Act expressly allowing it in all proper cases,  who can believe that they intended in the ninth section of that very act to use language which ought to be construed so as to deprive them entirely of a jury trial in that very class of cases where the refusal of it had long been denounced by them as oppressive, unlawful, and one of the grounds for a revolution? Should we thus brand them with duplicity, or tyranny?
As a single illustration that their views in the act of 1789 have probably been misconstrued or misapprehended, if seizures for breaches of the laws of revenue and trade were in reality "cases of admiralty and maritime jurisdiction," as meant in the constitution, then no statute was necessary, like a clause in that of 1789, to make them so, and to make them so not at the line of tide-water, which is here contended for, but wherever a boat of twenty tons could go from the ocean. And if they were not such cases to that extent and in that manner without a statute, but were common law and exchequer cases, then it is certain a statute would not make them "admiralty cases," but might devolve their trial on the District Court, allowing a jury, as that trial was expressly reserved by the amendment to the constitution in all common law cases. Stokes discloses the derogatory reason assigned for such a violation of our forefathers' rights by some of the British statutes before the Revolution (Stokes on Constitution of Colonies, 360). With much naiveté, he says,  "In prosecutions in the courts of vice-admiralty in the colonies for the breach of any act of Parliament relating to the trade and revenue of the colonies, all questions as well of fact *485 as of law are decided by a judge alone, without the intervention of a jury; for such was the inclination of the colonists in many provinces to carry on a contraband trade, that to try the fact of an information by a jury would be almost equivalent to the repealing of the act of Parliament on which such information was grounded. In other respects, I apprehend the proceedings should be conducted as near as may be to the practice of the Court of Exchequer in England." And the reason said to have been assigned by Judge Chase for the construction first put on the Judiciary Act  that seizures for violation of the laws of revenue and trade were meant by Congress to be treated as cases in admiralty, and tried without a jury, though they never had been so tried in England till the encroaching statutes, and never here except as our fathers declared to be illegally  is almost as harsh, and more derogatory on our fathers themselves, as being an act done by themselves, in saying it was to avoid "the great danger to the revenue if such cases should be left to the caprice of juries." The United States v. Betsey, 4 Cranch, 446, note.
Whoever could conjecture, for such a reason, that a statute was intended to have such a construction, seems to have forgotten the remonstrances of our fathers against the odious measures of England corresponding with such a construction; and to have overlooked the probable difference in the feelings of juries towards laws made by themselves or their own representatives, and those made by a Parliament in which they were not represented, and whose doings seemed often designed to oppress, rather than protect, them. And what presumption is there that an exclusion of juries from trials as to trade and revenue, for causes like these, was meant to be extended to torts?
The reason is totally inapplicable, and hence the presumption entirely fails. What a stretch of presumption without sufficient data is it to infer that this resisted case of seizures is first strong evidence of a larger jurisdiction in admiralty established here, and likely to be adopted under the constitution by those who had always ardently opposed it, and next is evidence of a larger jurisdiction in other matters, disconnected entirely with that and all the reasons ever urged in support of it?
The last inquiry on this question of jurisdiction is, What have been the decisions concerning the locality of torts in admiralty in the courts of the United States since the constitution was adopted?
It is the uncertainty and conflict concerning these, which has in part rendered it necessary to explore with so much care how the law was here, when our present system of government went into operation
It is a matter of surprise, on a critical examination of the books, to see upon how slight foundations this claimed departure from the *486 established law in force in England as to torts rests, when looking to precedents in this country. I do not hesitate to concede to the advocates of a change, that the doctrine has been laid down in two or three respectable compilers. Curtis on Merchant Seamen, 362; Dunlap's Ad. 51. But others oppose it; and we search in vain for reasons assigned anywhere in its favor. The authorities cited from the books of reports in favor of a change here are not believed, in a single instance, to be in point, while several appear to maintain a contrary doctrinè.
They are sometimes mere dicta, as the leading case of De Lovio v. Boit, in 2 Gall. 467, 424, that having been a case of a contract and not a tort; or as in 1 Mason, C.C. 96, that having occurred on the high seas. So Thomas v. Lane, 2 Sumner, 1; Ware, 75, 96; 4 Mason, C.C. 380. Or they are cases cited, such as Montgomery v. Henry, 1 Dall. 49, which relate to contracts alone. (See, also, case by Judge Conkling, in New York Leg. Ob., Oct. 1846; The Mary, 1 Paine's C.C. 673). Or they happened, as was averred in 1 Dall. 53, on waters out of any county. Or they are cases of seizure for breaches of the laws of trade, and navigation, and revenue, depending on express statute alone. The Vengeance, 3 Dall. 297; The Betsy, 4 Cranch, 447; Wheelan v. The United States, 7 ibid. 112; Conkling's Pr. 350; 1 Paine's C.C. 504; Gilp. 235; 1 Wheat. 920; 8 ibid. 391. And are, as before explained, probably misconstrued.
The parent of many of these mistaken references, and of the decisions as to seizures, is the case of The Vengeance, in 3 Dall. 297, a case which Chancellor Kent, in his Commentaries, justly says "was not sufficiently considered" (vol. 1, p. 376). It was not a case of tort, as some seem to suppose; nor even a seizure, under the act of 1789, for a breach of the laws as to revenue and trade. But it was an information for exporting arms, prohibited by a special act, passed 22d May, 1793.
Some of the references, likewise, are to cases of prize, which in England as well as here never depended on locality, like the high seas, but might be even on land, and were at first conferred on the admiralty courts by special commission, and were not originally a part of its permanent jurisdiction. 10 Wheat. 315; 5 ibid. 120, App.; 4 Dall. 2; Doug. 613, note; 1 Kent's Com. 357. Where any of the references in the books here are to printed cases of tort, they uniformly appear, to have been committed on the high seas, or without the body of a county and State. Burke v. Trevitt, 1 Mason, 96, 99, 360; Manro v. The Almeida, 10 Wheat. 474, 486, 487; The Josefa Segunda, ibid. 315; Thomas v. Lane, 2 Sumner, 1; The Appollon, 9 Wheat. 368; Plummer v. Webb, 4 Mason's C.C. 380, and Ware, 75; Steele v. Thatcher, Ware, 96. If the act happened in foreign countries, in tide-waters, there may well be jurisdiction, as being not within the body of any county here. *487 Thomas v. Lane, 2 Sumner, 9. Such was the case of The Appollon, 9 Wheat. 368, not being a case within tide-waters and a county in this country.
There is an expression in 12 Peters, 76, which is supposed by some to sanction a change. But it is only a dictum, that having been a case of crime, and the idea and the expression are, not that torts or crimes could be tried in admiralty, when committed within a county, on tide-water therein, but that in no case, if committed on land or above tide-water, could they be tried there as admiralty offences, but only as offences defined and punished by acts of Congress under the power to regulate commerce. United States v. Coombs, 12 Peters, 76. This may be very true, and yet in torts, as well as crimes, they may not be punishable without a statute, and as mere admiralty cases, unless committed on the ocean.
During this session I have for the first time seen a case decided in one of our circuits, which holds that the tide-waters of the Savannah river are within the jurisdiction of the admiralty, as to collisions between boats. Bullock v. The Steamboat Lamar, 1 Western L.J. 444. But as the learned judge seems to have taken it for granted that the question of jurisdiction had been settled by previous decisions, he does not go into an examination of its principles, and cites only one authority (7 Peters, 324), which will be found to be a case of contract and not tort. So that, with this single exception, so far as it be one, not a single reported case is found, and only one manuscript case referred to (Dunl. Adm. 51), where a tort was committed within one of our counties, though on tide-water, which was adjudged to be within admiralty jurisdiction, since the country was first settled, or of a like character in England, unless by recent statutes, for the last four centuries.
On the contrary, in Bee's Admiralty Reports and Peters's, in Gilpin's and Ware's, cases for torts are found, but all arising on the high seas, unless some doubt exists as to one in the last, partly overruled afterwards in the Circuit Court. So, whatever may be the obiter dicta, it is the same as to all in Paine, Washington, Baldwin, and even Gallison, Mason, Sumner, and Story. Indeed, this result accords with what was rightfully to be anticipated from the rule laid down in the first elementary law-book in the hands of the profession at the time of the Revolution, that "admiralty courts" (3 Bl. 106), had cognizance of what is "committed on the high seas, out of the reach of our ordinary courts of justice." And "all admiralty causes must be, therefore, causes arising wholly upon the sea, and not within the precincts of any county." 3 Bl. Com. 106.
Moreover, as to American authorities directly against these supposed changes as to torts, it is hardly possible to find any thing stronger than the absence we have just referred to, almost entire, of any attempt in actions to sustain the jurisdiction in admiralty *488 over torts, unless happening on the high seas, and the uniform settled decisions in England, that it exists only there. But, beside this, there is the absence likewise of any colonial statutes or colonial decisions to bring in question at all the adjudged cases at home, which governed this question here no less than there. There is next the remark by Chancellor Kent, that if tides ebb and flow in a county, a recovery cannot be had for a tort there, on the principles of the common law courts. 1 Kent's Com. 365, note; 3 Hag. Ad. 369.
And no one can read the learned Digest of Dane without seeing that in torts he considers the trial by jury proper, wherever they occur within the body of any county. 6 Dane's Abr. Prohibition. And it is laid down generally, in several other instances in this country, that the locality of torts must be on "the sea," in order to confer jurisdiction on the admiralty. Thackery et al., Gilp. 524, 529; 3 Mason, 243; Baldw. C.C. 550-554. So in Adams v. Haffards, 20 Pick. 130. See also the colonial case before cited from 1 Dall. 53, Montgomery v. Henry et al., directly in point, that the line of the county was the test, and not tide-water, unless without the county. This was in 1780, and is most conclusive proof, that no colonial enlargement of mere admiralty jurisdiction as to this matter had occurred here in practice, either under the words of commissions to vice-admiralty judges, or any difference of circumstances and condition.
But, beside this, one resolve of the old Congress shows, that they considered the line of the county as the true one; and hence its violation in cases of trade and revenue, under statutes passed to oppress them, caused their remonstrances that the vice-admiralty courts had transgressed the ancient limits of the bodies of counties. 1 Journal of Old Cong. 21-23. How unlikely, then, is the inference from this, that the framers of the constitution regarded this encroachment as the true line, and, when protesting against it, not only meant to adopt it, but extend it to cases of torts?
It is not a little remarkable, too, that in maturer life Judge Story himself, in speaking of the jurisdiction over torts (3 Com. on Constit. 1659), says,  "The jurisdiction claimed by the courts of admiralty as properly belonging to them extends to all acts and torts done upon the high seas, and within the ebb and flow of the sea." That means, at common law, outside of a county.
Thus says Coke, in 4 Inst. 134:  "So as it is not material whether the place be upon the waters infra fluxum et refluxum aquæ; but whether it be upon any water within any county." Sea Laws, 234. Again, the ebb and flow of tide, to give jurisdiction to the admiral, means on the coast outside. Fortescue, De Laudibus L. Ang. 68, note. So in 2 Madison Papers, 799, 800, it will be seen that Judge Wilson deemed the admiralty jurisdiction to relate to what the States had not exercised power over, and to the sea. So in The Federalist, No. 80, cases arising on the high seas are said to be those embraced.
*489 Indeed, the departure from the settled line of jurisdiction as to torts here, so far as it may have gone in theory or speculation, seems likely to have begun in mistake rather than in any old commission or adjudication, founded on any statute or any well-settled principle. It is likely to have commenced either by omitting to discriminate between torts and contracts, or between torts depending on general principles and seizures for violating laws of revenue and trade, which depended on the words of a special statute, and the construction given to those words; or from a supposed but unfounded analogy to the rules as to prizes, with which our fathers were very familiar in the Revolution, and taking cognizance of them in admiralty here, as in England, if captured anywhere, not only on tide-water or "below high-water mark," but even on land. 4 Dall. 2; 2 Bro. Civ. and Adm. Law, 112; 5 Wheat., App. 120. Or it may have occurred, and that probably was oftenest the case, from various general expressions in the English books and cases as to the admiralty jurisdiction being coextensive with tide-waters, when that expression means, in all the adjudged cases in England as to torts and crimes,  and must, on principle, as before shown, mean, in order to secure the trial by jury and the common law,  the tide-waters on the sea-coast, the flux and reflux of the tide, out of the body of a county.
There is a similar expression in Judge Story's Commentaries on the Constitution (vol. 3, § 1667), as to crimes, in speaking of the existence of admiralty jurisdiction over them in creeks "and bays within the ebb and flow of tide"; but he takes care to add, very properly, "at least in such as are out of the body of any county in a State." Probably the true origin of the whole error was by looking to expressions about tide-water, or the ebb and flow of tide, without noticing further that the act must be in such tide-waters as "are out of the body of any county in a State," and that this was indispensable to be observed, in order to protect the invaluable principles we have been discussing.
The power of the general government and its courts over admiralty matters was doubtless conferred on account of its supervision over foreign trade and intercourse with other nations, and not to regulate boats like these, far in the interior, and never going to any foreign territory, or even adjoining State, much less touching the ocean. Nothing can be more significant of the correctness of this limitation to matters on the ocean, than the remarks of Chief Justice Jay, in Chisholm v. Georgia, 2 Dall. 475, that the judicial power of the Union was extended to "cases of admiralty and maritime jurisdiction, because, as the seas are the joint property of nations, whose rights and privileges thereto are regulated by the laws of nations and treaties, such cases necessarily belong to national jurisdiction."
Our forms of proceeding, also, in admiralty, and which are founded *490 on substance, count usually on the transaction as having happened on "the high seas," knowing full well that they are the great theatre and territory for the exercise of admiralty law and admiralty power; and being obliged to make such an allegation in England in order to gain jurisdiction. Ross v. Walker, 2 Wils. 265.
Half the personal quarrels between seamen in the coasting trade and our vast shore fisheries, and timber-men on rafts, and gundalo men, and men in flat boats, workmen in the seacoast marshes, and half the injuries to their property, are where the tide ebbs and flows in our rivers, creeks, and ports, though not on the high seas: But they never were thought to be cases of admiralty jurisdiction when damages are claimed,  much less when prosecuted for crimes; never in creeks, though the tide ebbs and flows there through half of our seaboard towns,  never in rivers. All is within the county, and is usually tried before State officers and by State laws.
It has just been remarked by one of my brethren, as to torts and crimes, as has been before said by some in controversies as to contracts, that the statutes of Richard the Second were not in force in the colonies. See 2 Gall. 398, 473; 1 Peters's Ad. 233; Ware, 91; Hall's Ad. Pract. 17, Pref. I cheerfully concede it may well be doubted whether any portion of the common law or English statutes, passed before the settlement of this country, became in force here, unless suited to our condition, or favorable to the subject and his liberties. But these statutes were both. They were suited to the condition of those attached to the common law and jury trial in the colonies, no less than at home, and they were in favor of the rights and liberties of the subject, to be tried by his own and not foreign laws, and by a jury for all matters happening within the realm, and not on the high seas. And so far from ancient statutes of that character not having any force here, they had as much as those parts of the common law which were claimed, October 14, 1774, by Congress among the "indubitable rights and liberties to which the respective colonies are entitled." 1 Journal of Congress, 28. They came here with them, as a part of their admiralty law, as much as came any portion of the common law, or the trial by jury. They came as much as Magna Charta or the Bill of Rights, and they should exist here now, in respect to all matters, with all the vigor that characterized them at home at the time of our Revolution. Baldw. C.C. 551; Ramsey v. Alleyne, 12 Wheat. 638. So decided virtually in Montgomery v. Henry, 1 Dall. 53; Talbott v. The Three Briggs, 1 Dall. 106.
The principles, dear to freemen of the Saxon race,  preferring the trial by jury, and the common law, to a single judge in admiralty, and the civil law,  which were involved in these statutes, could be no less highly prized by our American fathers than their English ancestry, especially when we look to their numerous resolutions on *491 this subject, both before and during the Revolution, cited in other portions of this opinion.[*]
One of our soundest jurists has said long since,  "The common law of England, and every statute of that country made for the benefit of the subject before our ancestors migrated to this country, were, so far as the same were applicable to the nature of their situation, and for their benefit, brought over hither by them; and wherever they are not repealed, altered, or amended by the constitutional provisions or legislative declaration of the respective States, every beneficial statute and rule of the common law still remains in force." Tucker, in Part II. of Bl. Com App. 99; 2 lm. Op. 75; Woodcock, 159.[]
Whether the 13 and 15 of Richard II. were in affirmance of what was the true limit of admiralty jurisdiction at first in England, or otherwise, is not very material. But it is certain that it was likely to be but declaratory of that, as the people were so devoted to the common law trials by jury. The extraordinary idea, that these statutes were not in force here, was first broached in A.D. 1801, and then in a District Court, in direct opposition to the views expressed in 1 Dall. 53. The point then decided under that novel notion was, that a lien existed for repairs of a domestic ship, without the aid of any statute, and has been since expressly overruled by this court in The General Smyth, 4 Wheat. 413. And why overruled by this court, but on the principle that the admiralty jurisdiction here was what it had been in England before our constitution, and not elsewhere,  not that of France before the Norman conquest, or that of Holland now?
Indeed, Justice Story, as a commentator in respect to other clauses of the constitution no more open to such a construction than this, concedes that they are to be "understood" "according to the known distinction in the jurisprudence of England, which our ancestors brought with them upon their emigration, and with which all the American States were familiarly acquainted." 3 Story's Com. on the Constitution, 506, § 1639.
Nor let it be gain offered in extenuation, that, the power being concurrent in the common law courts, the plaintiff from choice goes into the admiralty; because the other party, who is often prosecuted only to be vexed and harassed, and who has rights as well as the plaintiff, may be thus forced into admiralty, rather than the *492 common law, much against his choice. Nor let it be said further, as an apology, that the trial by admiralty is better and more satisfactory, when our ancestors, both English and American, have resisted it, and excluded it in all common law cases, for reasons most vital to public liberty and the authority of the local tribunals. Such an enlargement of a power so disliked by our fathers is also unnecessary; because, if desirable to have the United States courts try such cases, rather than those of the States, they can be enabled to do it by express provisions, under the power to regulate foreign commerce and collect revenue, as is now done on the Lakes; 12 Peters, 75; 5 Statutes at Large, 726; Act of February 26th, 1845; and reserving, as in that case, the right of trial by jury.[*]
I have thus examined this question in all its various aspects, and endeavoured to answer all which has been suggested in favor of a change here as to the line of admiralty jurisdiction in the case of the collision of vessels, as well as other marine torts.
Among my remarks have been several, showing that there was nothing in our condition as colonists, or since, and nothing in the nature of the subject and the great principles involved, which should render the same line of jurisdiction not proper in America which existed in England, but in truth some additional reasons in favor of it here. I do not now, in conclusion, propose to dwell much on this peculiar condition of ours, though some members of this court have just urged it earnestly as a reason why the same line does not apply, as they have why the statutes of Richard II. did not apply. But the idea is as untenable in respect to the principle generally, looking to our condition, as we have already shown it to be in respect to those statutes. Thus, in that condition, what reason was there ever for a change? None. And, if otherwise believed, when we were colonies, would not the change have been made by acts of assembly approved at home, or an act of Parliament? And if not done when colonies, but supposed to be proper after the Revolution, would not the framers of the constitution, or of the Judiciary Act, have known it as quickly and fully as this court? and was it not more proper for them to have made such a change than this court? If our political institutions or principles required it, did not they know, and should not they have attended to that rather than we? If such a change had already happened in the then thirteen colonies, and was too well known and acquiesced in, *493 as to torts and crimes, to need any written explanation or sanction, why cannot it be pointed out in colonial laws, or in judicial records, or at least in contemporaneous history of some kind? And if such a change was required and intended, as some insist, by resorting to other than English law for a guide as to what were admiralty cases within the meaning of the constitution, because something less narrow, geographically or otherwise, as it has been argued, something on a grander scale, and in some degree commensurate in length and breadth with our mighty rivers and lakes, was needed,  as if a system which had answered for trade over all the oceans of the globe was not large enough for us,  then why not extend it at least over all our navigable waters, and not halt short at the doubtful, and fluctuating, and pent-up limits of tide-water? And was a change so much required to go into the bodies of numerous counties and States, to the jeopardy of jury trials, by any increased dislike to them among our jealous fathers? Were they wishing, by mere construction, to let more and more go into the cognizance of the admiralty and be tried without a jury, and without the principles of the common law, when they had been so indignantly remonstrating against any and every the smallest encroachment by England on that sacred trial? And is this guarantee of a jury trial in such cases to be considered of subordinate moment in the views of those living at the era of the formation of the constitution, and the passage of the act of 1789, when their eagerness was such to guarantee it fully, that two of the only twelve amendments ever made to it relate to additional safeguards for this trial? And in the Judiciary Act of 1789, there are introduced, ex industria, three separate provisions to secure jury trials.
Indeed, so far from there being any thing in our condition as colonists, or in public opinion at the Revolution, which demanded a change enlarging admiralty forms and jurisdiction, the old Congress specially resolved, November 25th, 1775, when recommending to the colonies to institute courts to try captures, or devolve the power on those now existing, that they "provide that all trials in such case be had by a jury," which was going further in their favor, instead of short of what had ever been done in England. And, in 1779, Virginia established admiralty courts, under recommendation of the old Congress, and expressly allowed a jury in all cases where either party desired it, if both were citizens. 10 Hening's Stat. 101. The same is understood to have been done in several other States. See The Federalist, No. 83. In Massachusetts, under the old charter, as long ago as 1673, the court of admiralty was expressly authorized to allow a jury when it pleased. Ancient Charters and Laws, 721 (App.). Iredell says, also, in the North Carolina Convention (4 Elliot's Deb. 155):  "There are different practices in regard to this trial in different States. In some *494 cases they have no juries in admiralty and equity cases; in others, they have juries in them as well as in suits at common law."
And to the objections made against adopting the constitution, because the trial by jury might be restricted under it and suitors be compelled to travel far for a hearing in ordinary cases (1 Gales's Debates in First Congress), it was argued that Congress would possess the power to allow juries even in cases in admiralty (The Federalist, No. 83), and afterwards, by the original amendments to the constitution, it was made imperative to allow them in all "cases at common law." Yet now, by considering torts within a county as triable, or as "cases in admiralty," which was not done by the common law, nor when the constitution was adopted, either in England or here, we produce both the great evils deprecated,  an abridgment of the jury trial from what prevailed both here and in England, and the forcing of citizens to a great distance from their State tribunals, to defend their rights under a different forum and a different system of laws.
After these additional proofs of the caution of our ancestors to check the usual admiralty power of trial without a jury, and more especially to prevent any extension of it, could they for a moment, when so jealous of the general government and its overshadowing powers, wish to extend them further than ever before, either here or in England?[*] Did they mean to relinquish their time-honored and long-cherished trial for torts on water within a county, and take for a model despotic France, for instance, which knew no trial by jury in any case, and where the boundaries between the admiralty and other courts were almost immaterial, being equally under the civil law, and equally without the safeguard of their peers? And would they be likely to mean this, or wish it, when every such extension of admiralty jurisdiction was at the expense of the State courts, and transferring the controversies of mere citizens of one State to distant jurisdictions, out of their counties and in certain events to the remote seat of the general government, and then to be tried there, not by the common law, with whose principles they were familiar, but by the civil, and when a full remedy existed at home and in their own courts? Much less could they be supposed willing to do this when the trial of facts in this court was not to be by their peers from the vicinage, or on oral testimony, so that the witnesses could be seen, scrutinized, and well compared, but by judges, who, however learned in the law, are less accustomed to settle facts, and possess less practical acquaintance with the subject-matter *495 in controversy. And what are the urgent and all-controlling reasons which exist to justify the new line urged upon us, in such apparent violation of the constitution, and with so inauspicious a departure from any thing required by our condition, or from what seems to have been the principles and precedents at the Revolution?
It is not the line even of the civil law, any more than of the common law. If this innovation had extended admiralty jurisdiction over all navigable waters, it would have been, at least, less vague, and found some vindication in its analogy to the civil code. Digest, 43, tit. 12, 13; Code Napoleon, B. 2, ch. 2, tit. 556; Zouch's Elements of Jurisp. 382. But the rule of tide-water within a county, and not on the sea, conforms to no code nor precedent; neither marching boldly over all which is navigable, nor halting where the ocean meets the land; neither shunning to make wide inroads into the territories of juries, nor pushing as far as all which is nautical and commercial goes. The only plausible apology for it, which I can find, is in a total misconception, before adverted to, of the ancient and true rule, which was tide-water, but at the same time tide-water without the body of the county, on the high seas. But instead of the flux and reflux of the tide on the high seas, and without the body of the county or State, and to support which line stood the great pillars of a jury trial and the common law, have been attempted to be substituted, and that without authority of any statute or clause in the constitution, as to torts, the impulses from the tides at any and every distance from the ocean, sometimes encroaching from one to two hundred miles into the interior of counties and States, and prostrating those great pillars most valuable to the people of the States. And what, let me repeat the inquiry, is gained by such a hazardous construction? Not an adherence to old and established rules, not a respect for State rights; not strengthening the Union or its clear powers where assailed, but weakening by extending them to doubtful, irritating, and unnecessary topics; not an extension of a good system, allowing the admiralty to be one for all nautical matters, to all navigable waters and commercial questions, but falling short, in some of our vast rivers or inland seas, near one thousand miles from the head of navigation, and cutting off several cities with twenty, thirty, and even forty thousand population. The late act of February 26th, 1845 (5 Statutes at Large, 726), was intended to remedy this, but does not include any cases above tide-water on the Mississippi, or Cumberland, or Ohio, and many others, but only those on the Lakes and their tributaries, and very properly even there reserves, with scrupulous care, not only the right to either party of a trial by jury, but any remedy existing at common law or in the States.
So, looking to results, if we disclaim jurisdiction here, what evil can happen? Only that our citizens in this class of cases will be *496 allowed to be tried by their own State courts, State laws, and State juries. While, if we do the contrary, the powers of both States and juries will be encroached on, and just dissatisfaction excited, and the harmonious workings of our political system disturbed. So, too, if our national views have become actually changed so greatly, that a trial by a single judge, and in admiralty, is preferred to a trial by jury in the State tribunals or the Circuit Courts, then our overruling the jurisdiction in this case will only leave Congress to declare the change, and provide for it, rather than this tribunal.
So the excuse for trying such cases in admiralty rather than in courts of common law, which some have offered, on the ground that the rules of decision are much the same, appears very ill-considered, when, if the civil law in this instance does not differ essentially from the common law, the rules of evidence by it do, depriving us, as triers, of the sight of the witnesses, and their apparent capacity and character, and depriving the defendant of the invaluable trial by jury, and stripping him of the right of being tried, and the State courts of the right of trying controversies between their citizens, in the neighbourhood where they occur. "All controversies directly between citizen and citizen will still remain with the local courts," said Mr. Madison in the Virginia convention. 3 Elliot's Deb. 489.
Now, after all this caution exercised in England not to extend nor change admiralty jurisdiction there without the aid of express statute and a reservation of common law remedies,  after a refusal to do it here recently as to the Lakes and their tributaries, except in the same way, and preserving the trial by jury,  after all the sensitiveness of our fathers in not doing it as to seizures for breach of revenue and navigation laws, except by express statute,  after their remonstrances and cautions in various ways against abridging the trial by jury,  after the jealousy entertained when the constitution was adopted, that this court might absorb too much power from the State tribunals, and the respect and forbearance which are always justly due to the reserved rights of the States,  it certainly seems much wiser in doubtful cases to let Congress extend our power, than to do it ourselves, by construction or analogy.
So far from disturbing decisions and rules of property clearly settled, I am for one strongly disposed to uphold them, stare decisis, and hence I am inclined in this case to stand by the ancient landmarks, and not set every thing afloat,  to stand, in fine, by decisions, repeated and undoubted, which govern this jurisdiction, till a different rule is prescribed by Congress.
The first doubt as to the jurisdiction in admiralty over the present case is thus sustained, but, being overruled by a majority of the court, I proceed briefly to examine the next objection. It is one founded in fact. It denies that the tide did in truth ebb and flow at Bayou Gouia, the place of this collision, in ordinary times.
There is no pretence that the water there is salt, or comes back *497 from the ocean, or that the tide there sets upward in a current, or ever did, in any stage of the water in the Mississippi. Yet this is the ordinary idea of the ebb and flow of the tide. I concede, however, that it has been settled by adjudged cases, that the tide is considered in law to ebb and flow in any place where it affects the water daily and regularly, by making it higher or lower in consequence of its pulsations, though no current back be caused by it. Rex v. Smith, 2 Doug. 441; The Planter, 7 Peters, 343; Hooker v. Cummings, 20 Johns. 98; Angell on Tide Waters, 637. Yet this of course must be a visible, distinct rise an fall, and one daily caused by the tides, by being regular, periodical, and corresponding with their movements. Amidst conflicting evidence on a point like this, it is much safer to rely on collateral facts, if there be any important ones admitted, and on expert or scientific men, who understand the subject, than on casual observers. The sea is conceded to be two hundred and three miles distant; and the current of the Mississippi so strong as to be seen and felt far out to sea, sometimes quite forty miles. The tides on that coast are but eighteen or twenty inches high. The velocity of the current of the river is ordinarily three to four miles an hour in high water, and the river is two hundred feet deep for one hundred miles above New Orleans. Stoddard's Hist. of Louisiana, 158. It therefore becomes manifest, that on general principles such a current, with its vast volume of water, could not only never be turned back or overcome by the small tides of eighteen inches, as the fact of its influence forty miles at sea also demonstrates, but would not probably, in ordinary times, be at all affected in a sensible and regular manner two hundred and three miles distant, and weakened by all the numerous bends in that mighty river. From New Orleans to St. Louis the bends are such, that a boat must cross the stream 390 times. Stoddard's Hist. of Louisiana, 374.
Again, the descent in the river from the place of this collision to the ocean is quite a foot and a half, all the usual rise of the tide on the coast; and hence, at a low stage of water in the river, much more at a high one, thirty feet above the lowest, no tides are likely to be felt, nor would they probably be during the whole season of a full river, from November to June.
In the next place, several witnesses testify as to their observations in respect to the tides, and confirm what might be expected from these collateral facts. The most scientific among them took frequent observations for two years, at or nigh Jefferson College, thirty-seven miles nearer the sea than the place of this collision, to ascertain this very fact, and testifies that no regular daily influence is felt there from the tides. Oscillations may occur, but not regularly, nor as tides. They happen in that way even near the foot of the Falls of Niagara, but of course are produced by causes entirely disconnected *498 from the tides of the ocean. So they happen, from other causes, on most of our interior lakes.
Sometimes continued winds in one direction make a great difference in the rise of the water at different places; and sometimes, the emptying in near of large tributary streams, changeable in their size at different seasons. Both of these are testified to occur in the Mississippi in its lower parts. At high water, which prevails over half the year, from rains and the dissolving of snow, it also deserves notice, that the fall of the river towards the ocean is near one and two-thirds of an inch per mile; and the difference between high and low water mark near Bayou Goula is also, as before noticed, from thirty to thirty-three feet.
From all this it is easy to see, that, during more than half the year, it is hardly possible that a regular tide from the ocean should be felt there, though it is admitted that, in conflict with this, some witnesses testify to what they consider such tides there, and indeed as high up as Bayou Sarah. But their evidence is insufficient to overcome, in my mind, the force of the other facts and testimony on this subject.
In connection with this point, it seems to be conceded, also, that, in order to give admiralty jurisdiction, the vessels must be engaged in maritime business, as well as the collision have occurred where the tide ebbs and flows. There might be some question, whether the main business of either of these boats was what is called maritime, or touching the sea,  mare,  so as to bring them and their business within the scope of admiralty power. If, to do that, they must be employed on the high seas, which is the English rule, neither was so engaged in any part of its voyage or business. Or if, for that purpose, it is enough, as may be contended in this country, that they be engaged exclusively on tide-waters, neither was probably so employed in this instance. And it is only by holding that it is enough for one end of the voyage to be in tide-water, however fresh the water or slight the tide, that their employment can be considered maritime.
In The Thomas Jefferson, 10 Wheat. 428, the court say, the end or beginning of the employment may be out of tide-water, if "the service was to be substantially performed on the sea or tide-water." So in The Phbus, 11 Peters, 183. But in the case of the Thomas Jefferson, as well as the Phbus, the service, being in fact chiefly out of tide-waters, was not considered as maritime.
In the case of The Planter, 7 Peters, 324, the whole service performed was in tide-waters, and was a contract, and hence deemed maritime. Here the boats were employed in the trade between New Orleans at one point, and Bayou Sarah at the other, a distance of one hundred and sixty-five miles. If the tide ebbs and flows as high as Bayou Goula, or ninety-seven miles above New Orleans, which we have seen is doubtful, it is only a small fraction *499 above half the distance, but not enough above half to characterize the main employment of the vessel to be in tide-waters, or to say that her service was substantially on the sea, or even tide-water. The De Soto made trips still higher up than Bayou Sarah, to Bayou Tunica, twenty-seven miles farther from New Orleans. The testimony is, also, that both these boats were, in their construction, river, and not sea, boats; and the De Soto was built for the Red River trade, where no tides are pretended to exist, and neither was ever probably on the ocean, or within a hundred miles of it.
It is doubtful if a vessel, not engaged in trade from State to State, or from a State abroad, but entirely within a State, comes under laws of the general government as to admiralty matters or navigation. It is internal commerce, and out of the reach of federal jurisdiction. Such are vessels on Lake Winnipiseogee, entirely within the State of New Hampshire. In the Luda and De Soto they were engaged in internal commerce, and not from State to State, or from a State to a foreign country. 1 Tucker's Bl. Com. 250, note.
In most cases on the Mississippi, the boats are engaged in the coasting trade from one State to another, and hence are different, and assume more of a public character. So on the Lakes the vessels often go to foreign ports, as well as to other States, and those on the seaboard engaged in the fisheries usually touch abroad, and are required to have public papers. But of what use are custom-house papers or admiralty laws to vessels in the interior, never going from State to State, nor from a State to a foreign country, as was the situation and employment at the time of these two boats?
These are strong corroborations that this is a matter of local cognizance,  of mere State trade,  of parties living in the same county, and doing business within the State alone,  and should no more be tried without a jury, and decided by the laws of Oleron and Wisbuy, or the Consulat del Mare, or the Black Book of Admiralty, than a collision between two wagoners in the same county.
The second objection, then, as a whole, is in my view sustained; and, being one of mere fact rather than law, it is to be regretted that the court could not have agreed to dismiss the libel on that ground, without settling the other points, and without prejudice to the rights of either party in a trial at common law. The plaintiff would then be enabled to have all the facts on the merits examined and adjudicated by a jury from the valley of the Mississippi; much more skilful than this court, from their residence and experience, in judging upon accidents and negligences in navigation on that great thoroughfare.
The only good reason that the admiralty judge was ever intrusted with the decision of facts, rather than a jury, was, that originally he was but a deputy of the admiral, and often a nautical man,  acquainted with nautical matters, and acting only on them; and now in *500 England he calls to his aid on facts the experienced nautical officers or masters of the Trinity House,  "a company," says Coke, "of the chiefest and most expert masters and governors of ships." 4 Inst. 149. He takes their opinion and advice on the facts as to collisions of vessels before he himself decides. 2 Bro. Civ. and Ad. Law, 112; 6 D. & E. 766; The Celt, 3 Hag. Ad. 327. The case is often fully argued before them first. 1 Wm. Rob. 133-135, 273, 314; Hall's Ad. Pr. 139; 5 Rob. Ad. 347. But every thing here is so different, and so much against the skill of judges of this court in settling such facts, that in cases of doubt we are very likely, as has now happened, to disagree, and it is far better they should be examined by a jury in the vicinage of the collision.
Perhaps it was a consideration like this that led to the doctrine, both abroad and here, in favor of the common law courts having concurrent jurisdiction in these cases of collision, even when they happen on the high seas. 1 Chit. on Pl. 152, 191; 15 Mass. 755; 3 East, 598; Percival v. Hickey, 18 Johns. 257; 15 Johns. 119; 14 Johns. 273; Curtis's Merch. Seamen, 367; 9 Johns. 138; Smith v. Condry, 1 Howard, 36; Gilp. 483; 4 Mason, C.C. says it is claimed; 2 Gall. 343 on precedent.
Indeed, the laws of Louisiana are quoted as pertaining to and regulating the conduct of boats when passing on the Mississippi within that State. 1 Bullard & Curry's Dig. § 794. But so far from their being a guide to us in admiralty, if having jurisdiction in that way over these boats at this place, the rights of parties, as before seen in such questions, are to be settled by the laws existing in some undescribed part of the world, but not England in A.D. 1776 or A.D. 1789, or Louisiana in A.D. 1845. If England, this case would not be tried at all in admiralty, as we have seen; and if Louisiana, then the case would not be settled by admiralty law, but by the laws of Louisiana, and in the State tribunals.
Again, whoever affirms jurisdiction to be in the courts of the United States must make it out, and remove all reasonable doubts, or the court should not exercise it. Bobyshall v. Oppenheimer, 4 Wash. C.C. 483; 7 Peters, 325; Peters's C.C. 36. Because these courts are courts of limited jurisdiction, and acting under express grants, and can presume nothing beyond the grant, and because, in respect to admiralty power, if any thing is presumed when not clear, it is presuming against the trial by jury, and the State tribunals, and their reserved rights. Where a jurisdiction is of a limited nature, "they [claiming it] must show that the party was brought within it." 1 East, 650. And where a case is in part dependent on common law, and in part on admiralty, it must be tried in the courts of the former. Bee's Ad. 470.
But the second objection to our jurisdiction being also considered by the court untenable, this case is to be examined on the *501 merits; and as to these it seems to me not free from difficulty, though in my view indicating some fault in both the boats.
From the very nature of navigation,  as vessels cannot be always turned quick, and as a constant lookout is hardly practicable both night and day,  collisions on rivers with frequent bends in them, like the Mississippi, and during darkness, are occasionally almost inevitable, and often are attended by no blame. The danger and injury to both vessels is so great in almost every case, one or both not unseldom going down, with all on board, that the strongest motives exist with all to use care and skill to avoid collisions. The want of them, therefore, is never to be presumed, but is required to be clearly proved. To presume otherwise would be to presume men will endanger their own lives and property, as well as those of others, without any motive of gain or ill-will.
Hence our inquiries must start with the probability, that, in such collisions, accident and misconception as to courses and distances caused the injury, rather than neglect or want of skill. Indeed, in these cases it is laid down as a rule by Sir Christopher Robinson, in The Ligo, 2 Hag. 356, that "the law requires that there shall be preponderating evidence to fix the loss on the party charged, before the court can adjudge him to make compensation." 2 Dod. 83. I am unable to discern any such clear preponderance in this case in favor of the Luda. It is true that some allowance must be made as to the testimony of the officers and men in each boat. In both they would naturally be attached to her character or interests, and desirous in some degree of vindicating themselves or friends. And it happens that, from such or some other cause, those on each side usually testify more favorably as to the care and skill with which the boat was conducted in which they were employed at the time. Hence resort must be had to some leading and admitted facts as a guide, when they can be distinctly ascertained, to see whether the collision was from any culpable misconduct by either. For like reasons, we should go to witnesses on shore and passengers, where they had means of knowledge, rather than to the officers and crews implicated on either side. Taking these for our guidance chiefly, and so far as it is possible here to decide with much accuracy, most of the case looks to me, on the facts, quite as much like one of accident, or one arising from error of judgment and mutual misapprehension, as from any culpable neglect on the part of the officers of the De Soto alone.
It is to be remembered, that this collision occurred in the night; that neither of the regular captains were on the deck of either boat, though both pilots were at their stations; that being near a landing, the De Soto supposed the Luda was going to stop there, and hence pursued a different course from what she would if not so supposing; and that the Luda supposed the De Soto would not stop there, and hence did not pursue the course she would if believing she was *502 about to stop. That both boats in the darkness seemed, till very near, to believe each other farther off than they in truth were, and hence did not use so early the precautions they otherwise might have done. It is to be remembered, also, that not one of the usual sources of blame in the adjudged cases existed here clearly on the part of the De Soto. Some witnesses swear to the De Soto's having her light hung out, and several, including a passenger, that if the Luda had not changed her course unexpectedly, and when near, she would not have been struck by the De Soto; and that the De Soto, if changing hers, and going lower down than her port, did so only to round to and lay with her head up in the customary manner. Nor was there any racing between rivals, to the peril of the vessels and life, which led to the misfortune, and usually deserves condign punishment. Nor was any high speed attempting for any purpose; and the movement of the De Soto, though with the current, is sworn to have been slowest, and hence she was less bound to look out critically. The Chester, 3 Hag. Ad. 319. Nor is there any law of admiralty requiring a descending boat on a river to lie still till an ascending one approaches and passes, though an attempt was made to show such a usage on the Mississippi, which was met by counter evidence. Again, the Luda was not at anchor, so as to throw the duty on the De Soto to avoid her, as is often the case on the sea-coast. The Girolamo, 3 Hag. Ad. 169; The Eolides; ibid. 369. Nor was the Luda loaded and the other not, but in ballast and with a wind, and hence bound not to injure her. The Baron Holberg, 3 Hag. Ad. 244; The Girolamo, ibid. 173. Nor was one moved by steam and the other not, and hence the former, being more manageable, obliged to shun the latter. The Shannon, 2 Hag. Ad. 173; The Perth, 3 Hag. Ad. 417. Nor is there a rule here, as in England, issued by the Trinity House in 1840, and to be obeyed or considered bad seamanship, that two steamboats approaching, and likely to hit, shall put their helms to port, though the principle is a sound one on which it rests. 1 Wm. Rob. 274, 275; 7 Jurist, 380, 999. Under considerations like these, if any blame rests on the De Soto, and there may be some, certainly quite as much seems to belong to the Luda. Neither put the helm to port. Both boats were in my view too inattentive. Both should have stopped their engines earlier, till the course and destination of each other were clearly ascertained; and both should have shaped their courses wider from each other, till certain they could pass without injury. 7 Jurist, 380; 8 ibid. 320. The Luda certainly had more conspicuous lights, though the De Soto is sworn not to have been without them, and is admitted to have been seen by the Luda quite half a mile off, though in the night. On the contrary, the movements of the De Soto were slowest, which is a favorable fact in such collisions (7 Jurist, 381), though she did not lie by, as she should have done, under the law of Louisiana, if that was in force, *503 and she wished to throw all the risk on "the ascending boat"; for throwing that risk so is the only gain by conforming to the statute. 1 Louis. Dig. 528, Art. 3533, by Grimes.
But I do not propose to go more fully into this, as it is not the point on which I think the case should be disposed of. I merely refer to enough to show it is a question of difficulty and doubt whether the injury did not result from casualty, or mutual misapprehension and blame, rather than neglect, except in particulars common to both, or at least in some, attached to the plaintiffs, if not so great, as those in respect to which the original defendants erred. Any fault whatever in the plaintiffs has, it is said in one case, been held to defeat his action. Vanderplank v. Miller, Moody & Malk. 169. But in any event, it must influence the damages essentially. For though, when one vessel alone conducts wrongfully, she alone must pay all damages to the extent of her value (5 Rob. Ad. 345), and this agrees with the laws of Wisbuy if the damage be "done on purpose" (2 Peters's Ad. 84, 85, App.), and with the laws of Oleron (2 ibid. 28); yet if both vessels were culpable, the damage is to be divided either equally between them (3 Hag. Ad. 328, note; 4 Adolph. & Ell. 431; 9 Car. & P. 613; Reeves v. The Constitution, Gilpin, 579), or they are to be apportioned in some other more appropriate ratio, looking critically to all the facts. The Woodrop-Sims, 2 Dod. Ad. 85; 3 Scott, N.R. 336; 3 Man. & G. 59; Curtis's Admiralty, 145, note. So in England, though no damages are given, when there is no blame on the part of the defendant. The Dundee, 1 Hag. Ad. 120; Smith et al. v. Condry, 1 Howard, 36; 2 Browne's Civ. and Ad. Law, 204. Yet, by the laws of Wisbuy, 1 Peters's Ad. 89, App.,  "If two ships strike against one another, and one of them unfortunately perishes by the blow, the merchandise that is lost out of both of them shall be valued and paid for pro ratâ by both owners, and the damage of the ships shall also be answered for by both according to their value." Sea Laws, 141. This is now the law in Holland, and is vindicated by Bynkershoek, so as to cover cases of doubt and equalize the loss. 2 Browne's Civ. and Ad. Law, 205, 206. So now on the Continent, where a collision happened between vessels in the river Elbe, and it was not the result of neglect, the loss was divided equally. Story's Conflict of Laws, 423; Peters et al. v. Warren Ins. Company, 14 Peters, 99; 4 Adolph. & Ell. 420.
Hence, whether we conform to the admiralty law of England on this point, though refusing to do it on other points, or take the rule on the Continent for a guide, the amount of damages allowed in this case is erroneous, if there was any neglect on the part of the original plaintiffs, or if the collision between the boats was accidental.
Judge DANIEL requested his dissent to the judgment of the court to be entered on the record, and for reasons concurring generally with those offered by Judge Woodbury.
*504 Mr. Justice GRIER concurred with Mr. Justice Woodbury in the opinion delivered by him, so far as it related to the question of the jurisdiction of courts of admiralty, and also that the weight of evidence in this case was against the existence of a tide at the place of collision, but concurred with the majority of the court that the De Soto was in fault, and justly holden for the whole loss occasioned by the collision.
NOTES
[*] And the vice-admiral is hence quaintly called "the justice of the peace for the sea," by Sir Leoline Jenkins; but who ever supposed him the justice of the peace two hundred miles inward from the sea?
[*] Woodcock on the British Colonies is equally explicit, that the vice-admiralty courts in the colonies were called so because in fact subordinate to the admiralty at home, and with like jurisdiction, except where altered by positive statute. Thus, speaking of "the jurisdiction of the admiralty over subjects of maritime contract," he says,  "With respect to this authority it may be only necessary to observe, that in such matters the admiralty court in the colonies holds plea agreeably to the course of the same court in England." (p. 272).
[*] They are so numerous as to remind one of the zeal and perseverance in favor of the great charter, which was such as to require it to be read twice a year in each cathedral, and to have it ratified anew over thirty times, when put in peril by encroaching monarchs. 1 Stat. at Large (English), 274, ch. 3; also, p. 1, note.
[] Thus people who go to form colonies "are not sent out to be slaves, but to enjoy equal privileges and freedom." Grotius, De Jure Belli, B. 2, ch. 9, § 10. Or "the same rights and privileges as those who staid at home." Or, as in the charter of Elizabeth to Raleigh, "enjoy all the privileges of free denizens or persons native of England." Part I. of Tucker's Bl., vol. 1, p. 383, App.
[*] As some evidence that the makers of this last law did not suppose it settled that the District Courts could, as admiralty courts, have any jurisdiction as to torts, because committed on tide-waters within a State, when they felt obliged to pass a special law to confer it on the Lakes, it was not conferred there as exercised on "tide-waters," which would have been sufficient, if so settled, but on "the high seas, or tide-waters within the admiralty and maritime jurisdiction," &c. This statute is also scrupulous to save the trial by jury when desired, and thus avoids treating it as an admiralty power got in torts, unless on the high seas, by a construction contrary to the political opinions and prejudices of our ancestors and to the whole spirit of our institutions.
[*] Indeed, in England it has been controverted whether the power in admiralty to punish torts anywhere ever existed, even before Richard II. (3 Mason's C. C-244), except through a jury, used to settle the facts and assess the damages. See 4 Rob. Ad. 60, note to Rucker's case. The Black Book of the Admiralty, art. 12, p. 169, is cited as speaking of the use of a jury twice in such cases. See also Roughten, De Of Admiralis, 69, note. And at this day, in England, in this class of torts, as hereafter shown, the masters of Trinity House act virtually as a jury.